927 F.2d 1332
 59 USLW 2561
 FRANKLIN FEDERAL SAVINGS BANK; Franklin Financial Group,
Inc.; George O. Haggard, Jr.; Ben B. Jarnagin; Richard C.
Jessee; A. Eugene Jolley; Jean S. Keener; George B.
McGuffin; Charles G. Robinette, Plaintiffs-Appellees,
v.
DIRECTOR, OFFICE OF THRIFT SUPERVISION, in his own official
capacity and as successor in interest to the Federal Home
Loan Bank Board; and the Federal Deposit Insurance
Corporation, in its own capacity and as successor in
interest to the Federal Savings and Loan Insurance
Corporation, Defendants-Appellants.
 No. 90-5971.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 16, 1990.
Decided March 12, 1991.
 
 John F. Dugger, Bacon, Dugger, Jessee & Perkins, Morristown, Tenn., Thomas Buchanan, J. Michael McGarry, III (argued), William D. Coston, Eric W. Bloom, Bishop, Cook, Purcell & Reynolds, Washington, D.C., for plaintiffs-appellees.
 Aaron B. Kahn, Harris Weinstein, Thomas J. Segal, Office of the Dept. of Treasury, Thrift Supervision, Jacob M. Lewis (argued), U.S. Dept. of Justice, Douglas Letter, Dept. of Justice, Appellate Staff, Civ. Div., Martin Jefferson Davis, Office of Thrift Supervision, Washington, D.C., John W. Gill, Jr., U.S. Atty., Marilyn L. Hudson, Asst. U.S. Atty., Knoxville, Tenn., Thomas A. Schulz, Dina L. Biblin, Federal Deposit Ins. Corp., Theodore C. Hirt, U.S. Dept. of Justice, Appellate Staff, Civ. Div., Stuart M. Gerson, Leslie H. Southwick, Brook Hedge, Gary W. Herschman, Dept. of Justice, Civ. Div., Washington, D.C., for defendants-appellants.
 Before KEITH and BOGGS, Circuit Judges; and CONTIE, Senior Circuit Judge.
 BOGGS, Circuit Judge.
 
 
 1
 Franklin Federal Savings Bank sees itself as a good institution on the rebound being hounded by federal regulators who refuse to keep their word. Franklin's predecessor, Morristown Federal Savings and Loan Association, began operating in 1935. In the 1980s, Morristown Federal Savings and Loan Association began having financial problems. Still, seven shareholders--all plaintiffs in this case--did believe that they could restructure the bank and solve its problems. Accordingly, they formed the Franklin Financial Group, a holding company that would take over Morristown, change its name to "Franklin Federal Savings Bank," and inject new capital. The Federal Savings and Loan Insurance Corporation ("FSLIC") and the Federal Home Loan Bank Board ("FHLBB") approved these changes.
 
 
 2
 Franklin thinks that, given time, the bank can regain its financial strength. When Franklin made its deal with the FSLIC and the FHLBB, the parties reached an agreement governing the accounting treatment of the bank for regulatory purposes. At least, Franklin thinks it had a deal. The Office of Thrift Supervision (successor to the FSLIC and the FHLBB) claims that any agreement by the FSLIC or the FHLBB regarding the accounting treatment to be applied to Franklin for the purpose of meeting its regulatory requirements constitutes a nonbinding statement of regulatory intent. This difference in views is important because, in the meantime, Congress passed FIRREA--the Financial Institutions Reform, Recovery, and Enforcement Act of 1989. FIRREA requires savings and loans to meet a whole host of new regulatory capital requirements. The OTS believes that FIRREA abolished all prior regulatory forbearances. Franklin thinks otherwise. These two issues--the nature of the understanding between Franklin and the FHLBB and the effect of FIRREA--are the crux of contention in this case. Franklin has received a permanent injunction preventing the OTS from applying new regulatory requirements to it. The OTS appeals, and we now reverse.
 
 
 3
 * Franklin's predecessor savings and loan began to have financial problems in the early 1980s. From 1983 to 1988, Morristown's losses averaged $230,000 a year. According to Franklin, these losses resulted from its having outstanding a number of relatively low-yield loans while, at the same time, it had to compete for depositors in a deregulated environment by paying higher interest. At oral argument, Franklin assiduously denied that its troubles resulted from speculative loans or mismanagement. Nonetheless, the officers of Morristown realized that something had to change if the bank was to survive. As early as 1984, the officers of Morristown, together with officials from the FSLIC and the FHLBB, began formulating a plan. Under the plan, Morristown would convert from the mutual to the stock form of organization and a holding company would acquire the troubled thrift, injecting needed capital.
 
 
 4
 As a result of these negotiations, a group of investors formed the Franklin Financial Group, Inc. for the purpose of acquiring Morristown. The investors who formed the Franklin Financial Group included a number of Morristown managers and directors, including Charles Robinette, who had, in March 1988, taken over as Chief Executive Officer of Morristown. In due course, the management of Morristown and the Franklin Financial Group submitted their proposal to the FSLIC and the FHLBB, the agencies that were required to approve such changes. Under the plan as submitted, Morristown would undergo a so-called "voluntary supervisory conversion" from the mutual form to the stock form. After the conversion, Franklin Financial would then acquire Morristown, which would operate henceforth as "Franklin Federal Savings Bank."The FSLIC and the FHLBB approved the transaction. In the acquisition of Morristown, the Franklin Financial Group "acquired" so-called "supervisory goodwill" in an amount equal to Morristown's net liability. Supervisory goodwill is an accounting construct used in certain types of transactions. When a business, such as a savings and loan, is purchased, and its liabilities exceed assets, the shortfall is carried on the books of the new institution as an asset--"supervisory goodwill." This "asset" is then written off--amortized--over a period of years, and is eventually no longer carried on the books.
 
 
 5
 The acquisition and supervisory conversion of Morristown required the approval of both the FSLIC and the FHLBB. Though the parties differ as to who it was that initiated the transaction, the FSLIC and the FHLBB clearly approved of and cooperated in the deal. On January 12, 1989, the Franklin Financial Group entered into a Voting and Disposition Rights Dividend Agreement with the FSLIC that spelled out the terms under which the Franklin Financial Group could acquire Morristown Federal Savings and Loan Association. Section VIII(D) states:
 
 
 6
 All references to regulations of the Board or the FSLIC used in this Agreement shall include any successor regulation thereto, it being expressly understood that subsequent amendments to such regulation may be made and that such amendments may increase or decrease the Acquiror's obligation under this Agreement.
 
 
 7
 (emphasis added). Previously, the FHLBB had sent Franklin a forbearance letter dated November 21, 1988. This letter reads, in part:
 
 
 8
 In connection with the approval by the Federal Home Loan Bank Board ("Board") of the Voluntary Supervisory Conversion and acquisition of Morristown Federal Savings and Loan Association ... the following forbearance is hereby granted.
 
 
 9
 1. For purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by Franklin Federal Savings Bank over a period not to exceed 25 years by the straight line method.
 
 
 10
 Franklin argues that this forbearance constitutes a binding part of its agreement with the FHLBB and the FSLIC. The FHLBB argues that the forbearance was merely a statement of regulatory intent rather than a binding contractual obligation on the part of the government.
 
 
 11
 Though the transaction was intended to benefit the Franklin Financial Group's investors, it did save the FSLIC a certain amount as well. While Morristown had not yet been placed into receivership, everyone agrees that Morristown was a troubled institution. Moreover, the transaction was not without cost to the shareholders of the Franklin Financial group either. At the time of the transaction, Morristown's liabilities exceeded its assets by $9.6 million. The FHLBB and the FSLIC believed that the Franklin Financial Group would have to contribute at least $3 million to make Franklin Federal a viable institution. Ultimately, the Franklin Financial Group invested $5 million in Franklin Federal. Evidently confident that Franklin Federal would succeed, the shareholders in the Franklin Financial Group borrowed the $5 million--securing the debt with their own collateral, not Franklin Federal's, and agreeing to be personally liable for the full amount. Franklin Federal has enjoyed a certain amount of success. In the 1989 calendar year, it earned $1.2 million. With the infusion of new capital, together with the modest success, Franklin's negative tangible capital has shrunk from approximately $9.6 million to $2.184 million as of July 1990.
 
 
 12
 The OTS claims that the forbearance letter does not bind it. The OTS argues that the forbearance letter merely constituted a "statement of regulatory intent" rather than a contractual obligation. Franklin notes that it received no assistance from the FSLIC other than the regulatory forbearance allowing its use of supervisory goodwill. Franklin says it never would have entered into the arrangement if it had not believed that the forbearance was binding on the government.
 
 
 13
 In 1989, Congress passed FIRREA. FIRREA sharply curtailed the use of supervisory goodwill in order to meet regulatory capital requirements in the thrift industry. Supervisory goodwill can now be amortized over no more than twenty years. 12 U.S.C. Sec. 1464(t)(9)(B). As the forbearance letter allows Franklin to amortize supervisory goodwill over a twenty-five year period, the statute cuts off five years.
 
 
 14
 In addition, the use of supervisory goodwill is being phased out in calculating "core capital," an accounting category that now must amount to no less than three percent of the institution's total asset base. 12 U.S.C. Sec. 1464(t)(2)(A). By January 1, 1995, supervisory goodwill cannot be used at all to calculate core capital. 12 U.S.C. Sec. 1464(t)(3)(A).
 
 
 15
 Franklin Federal asked the district court for an injunction forbidding either the FDIC or the OTS from applying the new regulatory changes to it. The district court entered a temporary restraining order against the OTS and the FDIC after an ex parte hearing. After doing so, the judge held a hearing for a preliminary injunction, which was collapsed into a hearing on a permanent injunction pursuant to Fed.R.Civ.P. 65(a)(2). After hearing evidence, the district court granted Franklin Federal's motion for a permanent injunction. The injunction prohibited either the FDIC or the OTS from "excluding the amortization of supervisory goodwill from any and all determination of the plaintiff institution's capitalization as set out in the [forbearance letter]." The district court did not indicate whether its injunction prevented limitations on the uses of supervisory goodwill other than the limitation on the time for amortization, such as the limitations on its use to meet core capital requirements.
 
 II
 
 16
 We decide this case together with a companion case involving similar issues, First Federal Savings Bank v. Ryan, 90-1785, 927 F.2d 1345 (6th Cir.1991). In First Federal, we held that the plaintiff institution's claim for an injunction against the OTS prohibiting the OTS from appointing a conservator or receiver was not ripe for review. This case arises in a somewhat different posture. Here, the plaintiff institution has asked for and received an injunction against the application of certain rules. In First Federal, by contrast, the plaintiff institution asked for (but did not receive) an injunction preventing the OTS from taking a particular action--appointing a conservator or receiver--in accordance with applicable statutes and regulations. Though we think that this is a close case, we conclude that Franklin's claim, unlike First Federal's, is ripe for review.
 
 
 17
 In order to determine whether a claim is ripe for review, we must apply a two-part test. "Courts must first 'determine whether the issues tendered are appropriate for judicial resolution,' and then 'assess the hardship to the parties if judicial relief is denied at that stage.' " Young v. Klutznick, 652 F.2d 617, 625 (6th Cir.1981), quoting Toilet Goods Association v. Gardner, 387 U.S. 158, 162, 87 S.Ct. 1520, 1523, 18 L.Ed.2d 697 (1967). In order to be ripe for review, a dispute must satisfy both prongs of the ripeness test. Production Credit Association v. Farm Credit Administration, 846 F.2d 373, 375 (6th Cir.1988).
 
 
 18
 We begin, then, with the question of whether the issues are appropriate for judicial resolution. The Supreme Court, in what may be the seminal ripeness case, Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), analyzed whether the issues in that case were appropriate for judicial resolution by applying several factors, which we consider seriatim.
 
 
 19
 The Supreme Court began with the fact that the issue before it in that case was purely legal. Id. at 149, 87 S.Ct. at 1515. In First Federal, we held that the issue presented there was not purely legal because determining whether the situation required the OTS to appoint a conservator or receiver would depend on numerous factual determinations, all of which might be subject to change. While there are some factual determinations that are relevant to this case, the issues are, for the most part, purely legal. All agree that FIRREA contradicts the express undertaking of the FHLBB in its forbearance letter. The question for us is whether the forbearance letter is a contract binding on the OTS and, what effect, if any, FIRREA had on that contract. To the extent that factual issues are relevant, all of the important events have already transpired. Moreover, in this case, as in Abbott Laboratories, "both sides have approached this case as one purely of congressional intent." Id. at 149, 87 S.Ct. at 1516.
 
 
 20
 The second factor analyzed by the Supreme Court is much closer: whether the regulations at issue constitute "final agency action" as defined by the Administrative Procedure Act. Ibid. As the Supreme Court explained in Abbott Laboratories, the "cases dealing with judicial review of administrative actions have interpreted the 'finality' requirement in a pragmatic way." Ibid. While the OTS has not taken any action directly regarding the bank, such as appointing a conservator or receiver, the OTS has made a reasonably clear statement of its position. In Thrift Bulletin 38-2, the OTS took the position that it would apply the new capital standards to all savings and loans--even those that had previously been granted forbearances.
 
 
 21
 As a general rule, final agency action includes "interpretive decisions that crystalize or modify private legal rights." Federal Trade Commission v. Standard Oil of California, 449 U.S. 232, 247, 101 S.Ct. 488, 497, 66 L.Ed.2d 416 (1980) (Stevens, J., concurring). The D.C. Circuit has explained the purpose of the finality requirement as being to determine "if the agency's position is merely tentative or, on the other hand, whether the agency views its deliberative process as sufficiently final to demand compliance with its announced position." Ciba-Geigy Corporation v. U.S. Environmental Protection Agency, 801 F.2d 430, 436 (D.C.Cir.1986). While an agency may generally express tentative views without judicial review, "[o]nce the agency publicly articulates an unequivocal position, however, and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review." Ibid.
 
 
 22
 The OTS maintains that Thrift Bulletin 38-2 is not a final agency action. We believe, however, that its position on this issue contradicts its other arguments. On the strength of its stated position in Thrift Bulletin 38-2, the OTS demands, on the merits, the deference due it under Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We owe deference to an agency because the agency presumably has applied its particular specialized expertise to a problem. Thus, for example, we do not defer to positions taken by the agency in the course of litigation, as these positions are generally dictated by agency lawyers, not by those with the specialized expertise upon which courts legitimately rely. Investment Company Institute v. Camp, 401 U.S. 617, 628, 91 S.Ct. 1091, 1097-98, 28 L.Ed.2d 367 (1971) ("It is the administrative official and not appellate counsel who possesses the expertise that can enlighten and rationalize the search for the meaning and intent of Congress."). When an agency has acted so definitively that its actions are defended based on Chevron, we believe that its action should be treated as final. See, e.g., Ciba-Geigy, 801 F.2d at 437 ("We can divine no reason why the letter from the head of the EPA's Pesticide Division, speakding [sic] for the agency charged with administering FIFRA, would not be entitled to deference from the least dangerous branch.").
 
 
 23
 Accordingly, we are convinced that the position of the OTS is sufficiently unequivocal to be considered final. As in Ciba-Geigy, the agency's position is unambiguously stated and given without any indication that it might be subject to further modification or factual considerations that would affect the position of the OTS. Id. at 437. The OTS seems to have made up its mind.
 
 
 24
 Nor do we believe that review at this point would undermine the regulatory scheme. In First Federal, we decided that review would undermine the regulatory scheme because the statute gave the Director the sole discretion to appoint a conservator or receiver, with judicial review to come after appointment. Here, by contrast, we conclude that judicial interpretation would probably enhance rather than undermine the statutory scheme. We can see no factual contingencies that would affect the actions of the OTS, and an authoritative interpretation of statutory language will enable the OTS to be even more efficient in its implementation of the statutory scheme.
 
 
 25
 We turn now to the second prong of the ripeness inquiry: the hardship resulting from failure to provide judicial review. The focus of the hardship inquiry is on whether an agency position would affect the "primary conduct" of the party seeking judicial review. Toilet Goods Association v. Gardner, 387 U.S. 158, 163, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967). It is the position of the OTS that all financial institutions that received regulatory forbearances are bound by the new rules. The OTS does point out that it has the authority to grant exemptions from "almost all" of the sanctions resulting from failure to meet capital requirements. 12 U.S.C. Sec. 1464(t)(7). "Almost all" is not "all." Even if the OTS were to grant Franklin an exemption to the full extent of its authority, Franklin would still be constrained by the limits on asset growth, which the Director is not authorized to waive. 12 U.S.C. Sec. 1464(t)(6) & (7). Moreover, Franklin's ability to pay dividends to its shareholders depends on the strength of its balance sheet. Thus, while the harm to Franklin Federal is not as compelling as the harsh civil or even criminal penalties faced by the company in Abbott Laboratories, 387 U.S. at 152, 87 S.Ct. at 1517, we nonetheless believe that it is adequate to support judicial review.
 
 
 26
 While we conclude that the suit against the OTS is sufficiently ripe, the claim against the FDIC is a different story. The FDIC has, so far as we can tell, taken no action that has had any effect whatsoever on the plaintiff. The only thing that the FDIC might be able to do to Franklin would be to revoke its insurance coverage. If it were to do that, however, Franklin would be entitled to an adversary hearing prior to the termination of its insurance. 12 U.S.C. Sec. 1818(a)(2) & (3). That determination would then be subject to appellate review in accordance with the provisions of the Administrative Procedure Act. 12 U.S.C. Sec. 1818(h)(2). Thus, we conclude that the claim against the FDIC is not ripe for review.
 
 III
 
 27
 We begin our analysis of the merits of the district court's decision to grant the injunction by looking at the meaning of FIRREA. There is no question that the substantive provisions of FIRREA contradict the express terms of the forbearance letter of November 21, 1988. The most glaring contradiction is that the forbearance letter allows the amortization of supervisory goodwill over a twenty-five year period, while 12 U.S.C. Sec. 1464(t)(9)(B) requires amortization within twenty years. Although some might argue that the limitations on the use of supervisory goodwill to meet core capital requirements contradict the provisions of the forbearance letter as well, Franklin does not make this argument, conceding in its brief that it is bound by those provisions.
 
 
 28
 Nonetheless, Franklin adamantly maintains that it has the right to treat supervisory goodwill as an asset that can be amortized over twenty-five, not twenty, years. Franklin argues that Section 401(g) of FIRREA preserves the FHLBB forbearance. Section 401(g) reads, in relevant part:
 
 
 29
 (1) EXISTING RIGHTS, DUTIES, AND OBLIGATIONS NOT AFFECTED.--
 
 
 30
 Subsection (a) [eliminating the FSLIC and the FHLBB] shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home loan Bank Board, or any other person, which(A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of law with respect to such Board (other than title IV of the National Housing Act); and
 
 
 31
 (B) existed on the day before the date of the enactment of this Act.
 
 
 32
 FIRREA, Pub.L. No. 101-73, Sec. 401(g), 103 Stat. 183, 356 (1989). The dispute between Franklin and the OTS centers on this provision.
 
 
 33
 Franklin interprets this language to provide a saving provision for any bargained-for regulatory forbearances that constituted a part of any contract between a financial institution and the FHLBB. Franklin stresses the word "any," as in the phrase "any right, duty, or obligation." (emphasis added) It argues that, as its forbearance agreement was a contract between it and the FHLBB, it would fall within the Act's language saving "any right, duty, or obligation." According to Franklin, Congress knew that there were contracts to which the FHLBB was a party and acted explicitly in Sec. 401(g)(1) to save such agreements. Franklin maintains that, if the language of this provision was not meant to include forbearance agreements, then Congress should have added the phrase "except forbearance agreements that contradict the substantive provisions of this Act," or similar language.
 
 
 34
 The OTS offers a much narrower interpretation of this language. Section 401(g)(1) begins "[s]ubsection (a) shall not affect the validity of any right, duty, or obligation...." (emphasis added). The OTS maintains that only those obligations that might possibly have been affected by subsection (a) are included in the scope of the saving clause. Subsection (a) merely abolishes the FSLIC and the FHLBB. FIRREA, Pub.L. No. 101-73, Sec. 401(a), 103 Stat. 183, 354 (1989). Thus, according to the OTS, Sec. 401(g)(1) is merely intended to save those obligations that might have inadvertently been eliminated by the abolition of the FSLIC and the FHLBB--and only those provisions.
 
 
 35
 We believe that the language of the statute supports the OTS's interpretation. Section 401(g)(1) explicitly states that "[s]ubsection (a) shall not affect the validity of any right, duty, or obligation of the ... Federal Home Loan Bank Board...." The provision does not, by its terms, speak to the effect that other sections of FIRREA might have on the rights, duties, or obligations of the FHLBB. We conclude that the plain language of the statute limits the reach of section 401(g)(1) to those obligations that could have been affected by virtue of the abolition of the FSLIC or the FHLBB. We find no support in the language for the notion that it was intended to limit the scope of FIRREA's substantive provisions. In essence, the provision is intended to assure that the OTS remained in privity with the FSLIC and the FHLBB, not to exempt banks with forbearance agreements from the substantive provisions of FIRREA.
 
 
 36
 Our conclusion that Section 401(g)(1) saves only those obligations that could have been affected by the elimination of the FHLBB's corporate existence is, moreover, strengthened by an analysis of nearby provisions. When analyzing the meaning of a particular provision, we can also look at the statutory framework in which the provision is embedded. See Coit Independence Joint Venture v. Federal Savings & Loan Insurance Corporation, 489 U.S. 561, 573-75, 109 S.Ct. 1361, 1369, 103 L.Ed.2d 602 (1989). Section 401(g)(2) allows for the continuation of lawsuits to which the FHLBB is a party after its abolition. Section 401(b) addresses the disposition of affairs during the period of transition when the OTS was just starting up; section 401(c) provides for the authority and status of the Chairman of the FHLBB. Section 401(f) is a saving provision paralleling section 401(g) that applies to the FSLIC rather than the FHLBB.
 
 
 37
 Both sides find comfort in the extensive legislative history of FIRREA. The OTS points to some portions of the legislative history in which some legislators express the view that abrogating the provisions of forbearance agreements allowing the amortization of supervisory goodwill would be a good idea, while Franklin points to other portions of the legislative history in which some legislators suggest that retaining such provisions would be a good idea. Both sides miss the point of looking to the legislative history.
 
 
 38
 Analyzing legislative history is valuable only to the extent that it tells us something about the meaning of the text. "Words do not have meanings given by natural law.... [S]uccessful communication depends on meanings shared by interpretive communities." Continental Can Company, Inc. v. Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund, 916 F.2d 1154, 1157 (7th Cir.1990). Legislative history is, in other words, "a clue to the meaning of the text" because it gives us some idea of the shared understanding of Congress. Id. at 1158.
 
 
 39
 Thus, we find the views of various representatives about the desirability of certain policies to be unenlightening in ascertaining the meaning of the statutory text. In the report of the Committee on Banking, Finance, and Urban Affairs, we find the "additional views" of two different groups of representatives stating opposing views regarding the meaning of the legislation before the House. One group stated that "forbearances are binding and enforceable.... [T]he government has the moral and legal obligation to stand behind every element of these agreements." H.Rep. No. 54, 101st Cong., 1st Sess. pt. 1 at 535 reprinted in 1989 U.S.Code Cong. & Admin.News 87, 328 (additional views of Reps. Hiler, Ridge, Bartlett, Dreier, McCandless, Saiki, Baker, and Paxon). While these views might seem to support Franklin's position, it is not at all clear to us from the context in which these statements appear that these representatives referred explicitly to the problem of supervisory goodwill. Even if they did, however, there are statements evincing a contradictory understanding earlier in the same report. Three other Representatives suggested that "[t]he committee's action is the same as the government asking a man to enlist in the Army for hazardous duty overseas and then suing him for deserting his wife and children." Id. at 497, reprinted in 1989 U.S.Code Cong. & Admin.News, 87, 292 (additional views of Reps. Annunizio, Kanjorski and Flake). While these two groups of Representatives evidently agreed that FIRREA ought to preserve forbearance agreements, they obviously differed with each other regarding the meaning of the statute. The full committee report is silent on the issue.
 
 
 40
 More persuasive than these views is the debate that took place regarding an amendment sponsored by Representative Hyde that would have given institutions such as Franklin an administrative hearing on their contract claims. 135 Cong.Rec. H2703 (daily ed. June 15, 1989). The amendment addressed exactly the sort of assisted transaction involved in this case and in First Federal. Members spoke vigorously on both sides of the Hyde Amendment. Representative Gonzalez opposed the amendment on the grounds that Congress had the right to change the rules and that the legislature had the responsibility to "ensure that this hideous crisis never reoccurs." Id. at H2705. Representative Annunzio, who supported the amendment, did so on the similar understanding that the treatment of supervisory goodwill in the unamended bill eliminated FHLBB forbearances. Ibid. Whatever side of the amendment they were on, the representatives who spoke on the Hyde Amendment did so with the understanding that the unamended statute did not provide an exception to the substantive requirements of FIRREA for institutions that had received forbearances from the FHLBB. The amendment was defeated in the House. Id. at H2718. No other amendment was adopted that could have affected the treatment of supervisory goodwill.
 
 
 41
 Franklin Federal suggests that Congress's vote on the Hyde Amendment could have been a vote against Representative Hyde's administrative procedures themselves rather than a vote against recognizing forbearances. This misses the point. In the course of the floor debate, representatives expressed their understanding of what the statutory language meant. The debate is useful to us because it reveals a shared understanding of a particular text. Nobody expressed the view that FIRREA did not abrogate forbearance agreements regarding supervisory goodwill. The only discussion of the procedures themselves came from the defenders of the amendment who emphasized that the amendment would not automatically recognize all forbearances. For example, Representative Ridge, a proponent of the amendment, stated that "[w]e are not grandfathering all supervisory goodwill for all time and under all circumstances." Id. at H2712. Thus, we believe that it is safe to say that, as of the time of this debate, it was the understanding of the House, if not the whole Congress, that FIRREA abrogated forbearances that contradicted its express terms.
 
 
 42
 In any event, the OTS's construction of FIRREA is plainly a reasonable one. The OTS does not contradict the plain language of the statute, and is therefore entitled to deference from the interpreting court. K-Mart Corporation v. Cartier, Inc., 486 U.S. 281, 290-92, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988); Chevron, U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).
 
 IV
 
 43
 As we conclude that FIRREA abrogates the regulatory forbearance issued to Franklin by the FHLBB, we do not need to reach the issue of whether that forbearance constituted a binding element of a contract between Franklin and the government, or, as the OTS claims, a mere statement of regulatory intent. If Franklin did have a contractual property interest, we believe that the evidence of congressional intent is strong enough to infer that Congress wanted to effect a taking. In the event that this action were determined to be a taking, Franklin would be entitled to compensation, not to equitable relief. See Anchor Pointe Boat-A-Minium Association, Inc. v. Meinke, 860 F.2d 215, 218 (6th Cir.1988).
 
 V
 
 44
 For the above reasons, the judgment of the district court is REVERSED.
 
 
 45
 CONTIE, Senior Circuit Judge.
 
 
 46
 For the following reasons, I respectfully dissent.
 
 I.
 
 47
 Though I agree with the majority's conclusion that "the suit against the OTS is sufficiently ripe," I do so for the reasons stated in my dissent in the companion case, First Fed. Sav. Bank, et al. v. Ryan, 927 F.2d 1345. Moreover, because the FDIC has threatened to terminate Franklin Federal's deposit insurance, I disagree with the majority's conclusion "that the claim against the FDIC is not ripe for review." See Appellees' Brief at 22 ("The OTS Supervisory Agent who is primarily responsible for the regulation of the institution informed Franklin Federal management that OTS would immediately seize the institution if FDIC initiates insurance termination proceedings. Thus, plaintiffs had no choice but to file this action when the Regional Director of FDIC subsequently informed the institution that the agency had decided to initiate insurance revocation proceedings in the absence of a new and significant capital infusion.").
 
 
 48
 Accordingly, I will now address the substantive merits of this action.
 
 II.
 A.
 
 49
 When Congress intends to upset previously settled expectations, it is obligated to do so in unambiguous terms. See Bush v. Oceans Int'l, 621 F.2d 207, 211 n. 4 (5th Cir.1980) ("[A] change in the status quo should not be inferred unless Congress has unmistakably indicated a wish to the contrary."). In the instant action, the government failed to identify any provision in FIRREA that expressly abrogates all conversion agreements; the government relies instead on strained inferences and select legislative history. Neither the courts nor the defendants are entitled to "impute to Congress such a radical departure from established law in the absence of express congressional command." Feres v. United States, 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950).
 
 
 50
 Contrary to the government's position, the only statutory provision in FIRREA that directly applies to the instant action expressly precludes the abrogation of contracts:
 
 
 51
 (g) SAVINGS PROVISIONS RELATING TO FHLBB.--
 
 
 52
 (1) EXISTING RIGHTS, DUTIES, AND OBLIGATIONS NOT AFFECTED.--
 
 
 53
 Subsection (a) [which abolishes FSLIC and FHLBB] shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which--
 
 
 54
 (A) arises under or pursuant to the Federal Home Loan Bank Act, the Home Owners' Loan Act of 1933, or any other provision of law applicable with respect to such Board (other than title IV of the National Housing Act); and
 
 
 55
 (B) existed on the day before the date of the enactment of this Act.
 
 
 56
 Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101-73, Sec. 401(g), 103 Stat. 183. Because the most basic tenet of statutory construction dictates that "courts are required, where possible, to give words their plain, unambiguous meaning," Lynch v. Lyng, 872 F.2d 718, 720-21 (6th Cir.1989), section 401(g)'s unambiguous language is conclusive "in the absence of 'a clearly expressed legislative intent to the contrary.' " United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (citation omitted).
 
 
 57
 Though the government readily admits that section 401(g) applies to obligations and duties, the government nevertheless contends that section 401(g) does not apply to conversion agreements (though the section does not expressly exempt conversion agreements from section 401(g)'s scope). Specifically, the government suggests that we narrow the breadth of section 401(g) to apply solely to "existing contracts to lease space, for office supplies, and the like...." If this were Congress' intent in enacting Sec. 401(g), however, Congress could have, and should have, restricted the section's wording to the procurement contracts identified by the government. Instead, Congress elected to save "any right, duty, or obligation of the United States....", see FIRREA Sec. 401(g), which arises under, or pursuant to, the Federal Home Loan Bank Act or the Home Owners' Loan Act of 1933. Moreover, because Congress was well aware of conversion contracts when it adopted section 401(g), Congress' decision not to specifically exclude such contracts from section 401(g) might reflect Congress' intent to extend the section's protection to include existing conversion contracts. See United States v. Rohm & Haas Co., 500 F.2d 167, 171 (5th Cir.1974) (citing De La Rama S.S. Co. v. United States, 344 U.S. 386, 389-90, 73 S.Ct. 381, 383-84, 97 L.Ed. 422 (1953)), cert. denied, 420 U.S. 962, 95 S.Ct. 1352, 43 L.Ed.2d 439 (1975) ("Such a reading of the savings clause is consistent with the rule that savings clauses are to be broadly construed.").
 
 
 58
 Though the government argues that section 401(g) protects only those rights, duties and obligations endangered by the abolition of the FSLIC and the FHLBB, not by the enactment of FIRREA, the government's contention merely manipulates the express language of section 401(g). Section 401(g) preserves FSLIC's and FHLBB's pre-existing duties and obligations though the agencies no longer exist. Semantics notwithstanding, section 401(g)'s express language dictates that FIRREA not relieve the government of its existing legal duties and/or obligations.
 
 
 59
 The government similarly argues that defeat of the proposed Hyde Amendment conclusively establishes Congress' intent to abrogate all bargained-for forbearances that permit pre-FIRREA capital standards. Contrary to the government's contention, however, the issue before Congress when it considered the Hyde Amendment was not the validity of existing forbearances; instead, the Hyde Amendment contemplated the establishment of an administrative process to review possible contract claims. Though the appellants are correct that some representatives voted against the Hyde Amendment because they wanted all forbearance agreements abrogated, it is equally clear that many Congressmen opposed the Hyde Amendment because of the contemplated administrative process. Because the Hyde Amendment never presented Congress with the sole issue of whether conversion agreements should be abrogated, the amendment's defeat is irrelevant to this action because the appellants, the appellees, and this court can not determine, with any certainty, why Congress defeated the Hyde Amendment.
 
 
 60
 Though the appellants argue that FIRREA Sec. 401(h) (which provides that agency "orders, resolutions, determinations, and regulations ... shall continue in effect ... until modified, terminated, set aside, or superseded in accordance with applicable law....") allows the government to terminate forbearances, a bargained-for forbearance constitutes a binding "obligation" or "duty," not merely an order, resolution, determination or regulation. Accordingly, if FHLBB's forbearance letter to Franklin Federal constitutes a bargained-for forbearance, see infra, then section 401(g) preserves the resulting governmental "obligation." The government's reliance on section 401(h) is without merit.
 
 
 61
 Although Congress may have intended to abrogate all existing forbearances (gratuitous and bargained-for) when it enacted FIRREA, section 401(g)'s express wording preserves the government's existing "duties" and "obligations" which necessarily include bargained-for (quid pro quo ) forbearances. Accordingly, we must now determine whether an "obligation" or "duty" (pursuant to Sec. 401(g)) exists in this action (in the form of a bargained-for forbearance).
 
 B.
 The appellee argues:
 
 62
 What is at issue is whether Congress expressly abrogated all contracts between the government and the savings and loan industry. The Bank board undoubtedly granted forbearances to scores of institutions that applied for assistance. But Franklin Federal, and its holding company, stand in a different light. The forbearance obtained by Franklin Federal was specifically negotiated and bargained-for. It was, moreover, granted in consideration for Franklin Financial's agreement to acquire the ailing institution and to provide an immediate capital injection of $5 million of the shareholders' personal funds into the troubled institution. Hence, Franklin Federal's right to treat supervisory goodwill as an asset does not stem "solely from a regulatory forbearance" as the government contends, but rather rests on a binding and enforceable contract.
 
 
 63
 Appellee's Brief at 24 (citation omitted) (emphasis in original).
 
 
 64
 On January 12, 1989, the parties entered into a binding agreement deemed the "Voting and Disposition Rights/Dividend Agreement." The Agreement provided, inter alia, that:
 
 
 65
 B. This Agreement shall be deemed a contract made under and governed by Federal law.
 
 
 66
 C. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective transferees, successors, assigns, heirs, administrators, executors, and trustees.
 
 
 67
 ....
 
 
 68
 F. This Agreement has been duly authorized, executed, and delivered, and constitutes, in accordance with its terms, a valid and binding obligation of the Acquiror and the FSLIC....
 
 
 69
 ....
 
 
 70
 K. This Agreement, together with any understanding agreed to in writing by the parties, constitutes the entire agreement between the parties and supersedes all prior agreements and understandings of the parties in connection with the subject matter hereof.
 
 
 71
 Voting and Disposition Rights/Dividend Agreement at 8-9.
 
 
 72
 Accordingly, the appellees argue that the conversion agreement includes four documents: Franklin Federal's business plan; the dividend agreement; the supervisory case findings; and, most importantly, the November 21, 1988 forbearance letter. The forbearance letter, signed by the Acting Secretary of the Federal Home Loan Bank Board, states (in its entirety):
 
 
 73
 In connection with the approval by the Federal Home Loan Bank Board ("Board") of the Voluntary Supervisory Conversion and acquisition of Morristown Federal Savings and Loan Association, Morristown, Tennessee ("Morristown"), by Franklin Financial Group ("Franklin"), the converted institution shall be known as Franklin Federal Savings Bank, the following forbearance is hereby granted.
 
 
 74
 1. For purposes of reporting to the Board, the value of any unidentifiable intangible assets resulting from accounting for the acquisition in accordance with the purchase method may be amortized by Franklin Federal Savings Bank over a period not to exceed 25 years by the straight line method.
 
 
 75
 The forbearance extended by this letter does not relieve Franklin Federal Savings Bank of its continuing obligations to maintain records of its reserve and regulatory capital condition and to report its financial condition in accordance with applicable regulatory requirements. This letter does not and shall not be construed to constitute forbearance or waiver by the Board or the FSLIC with respect to any regulatory or other requirements other than those encompassed within the preceding paragraph 1. Other than the actions to enforce the regulatory requirements waived in accordance with paragraph 1 and the statutory provisions authorizing imposition of the waived requirement, insofar as such requirement is waived, the Board and the FSLIC expressly reserve all of their statutory rights and powers with respect to Franklin Federal Savings Bank including, without limitation, those under Section 5 of the Home Owners' Loan Act of 1933 and Section 406 and 407 of the National Housing Act.
 
 
 76
 Joint Appendix at 35.
 
 
 77
 Though the government challenges the district court's conclusion that the forbearance letter constitutes an integral part of the government's binding agreement ("obligation") with Franklin Federal Savings Bank, the government's arguments are unpersuasive.
 
 
 78
 The government first argues that the forbearance letter is merely a "unilateral grant by the regulator which did not give rise to a 'right, duty or obligation' within the meaning of Section 401(g)." The government's argument is belied, however, by the appellees' affidavits and the testimonial evidence presented at the preliminary injunction hearing. Charles Robinette, Franklin Federal's chief executive officer, testified that negotiations regarding the terms of the forbearance were conducted in the same manner as were the other terms of the acquisition. Robinette further testified that the forbearance was the linchpin of the agreement, adding that Franklin Financial would not have agreed to acquire Morristown had the government not agreed to the forbearance.
 
 
 79
 After reviewing all of the evidence, the district court held, inter alia, that:
 
 
 80
 2. The Court finds that the Federal Home Loan Bank Board had the authority to grant a forbearance as evidenced by the letter dated November 21, 1988 signed by the Acting Secretary, and that this grant gave the institution the right to amortize certain supervisory goodwill over a period not to exceed 25 years by the straight line method....
 
 
 81
 3. The Court finds that the voting and dividend agreement contemplates that other writings are also included in the full supervisory agreement as entered into by the defendants and the plaintiffs. The Court finds that the November 1988 grant of a forbearance is such a writing.
 
 
 82
 4. The Court finds that the forbearance agreement was an integral part of the entire agreement and was for the benefit of all parties in order to recapitalize the failing institution and prevent additional agency and taxpayer expenditures which would have been necessitated by a failure of the institution.
 
 
 83
 5. The Court finds that the plaintiffs would not have invested an additional five million dollars into this institution absent the forbearance agreement, inasmuch as Franklin Federal would have been insolvent and subject to closure at its inception absent this agreement.
 
 
 84
 District Court's July 16, 1990 Permanent Injunction Order at 1-2. The district court's factual findings may not be reversed unless clearly erroneous. Fed.R.Civ.P. 52(a). See also United Slate, Tile & Composition Roofers, Damp & Waterproof Workers Ass'n, Local 307 v. G & M Roofing & Sheet Metal Co., 732 F.2d 495, 498 (6th Cir.1984) ("The finding that an agreement existed between G & M and Local 307 is a factual determination and is thus subject to the 'clearly erroneous' standard of review."); Richter v. Westab, Inc., 529 F.2d 896, 899 (6th Cir.1976) (contract's existence reviewed under clearly erroneous standard).
 
 
 85
 The bargained-for (quid pro quo ) forbearance clearly constitutes an integral component of the negotiated agreement between the FHLBB and Franklin Federal and was not, as the government suggests, merely a gratuitous forbearance. Franklin Federal's shareholders bargained for the instant forbearance and provided the government valuable consideration in reliance upon the government's promise to allow Franklin Federal the right to amortize supervisory goodwill over a 25-year period. In similar circumstances, numerous district courts have treated the bargained-for (quid pro quo ) forbearances as contractual rather than as mere regulatory determinations (gratuitous forbearances). Sterling Sav. Ass'n v. Ryan, 751 F.Supp. 871 (E.D.Wash.1990); Security Fed. Sav. Bank of Florida v. Director, Office of Thrift Supervision, 747 F.Supp. 656 (N.D.Fla.1990); Far West Fed. Bank v. Director, Office of Thrift Supervision, 746 F.Supp. 1042 (D.Or.1990): Guaranty Fin. Serv., Inc. v. Director, Office of Thrift Supervision, 742 F.Supp. 1159 (M.D.Ga.1990). Accordingly, the district court's findings regarding the instant forbearance letter are not clearly erroneous.
 
 III.
 
 86
 For the aforementioned reasons, I respectfully dissent.