**CARTERET SAVINGS BANK, FA, Plaintiff,**

v.

**OFFICE OF THRIFT SUPERVISION, in its own capacity and as successor in interest to Federal Home Loan Bank Board; T. Timothy Ryan, Jr., individually and in his official capacity as Director of Office of Thrift Supervision; and Federal Deposit Insurance Corporation, in its own capacity and as successor in interest to Federal Savings and Loan Insurance Corporation, Defendants.**

**Civ. A. No. 91–661.**

United States District Court, D. New Jersey.

April 25, 1991.

---

LeBoeuf, Lamb, Leiby & MacRae by Frederick B. Lacey, Newark, N.J., for plaintiff.

Office of Thrift Supervision, Dept. of the Treasury by Aaron B. Kahn and Stephen E. Hart, Special Counsel, Washington, D.C., for defendants Office of Thrift Supervision and T. Timothy Ryan, Jr.

U.S. Dept. of Justice, Civ. Div. by Marcia K. Sowles, Trial Atty., Washington, D.C., and Michael Chertoff, U.S. Atty. by Susan C. Cassell, Asst. U.S. Atty., Newark, N.J., for defendant Federal Deposit Ins. Corp.

## OPINION

BISSELL, District Judge.

This matter arises before the Court on the basis of plaintiff Carteret's application for a preliminary injunction restraining the defendants from taking any regulatory action against it for failure to meet any and all such regulations as a result of defendants' refusal to permit plaintiff to utilize its "supervisory goodwill" in determining compliance with such regulations.

## I. FACTS AND BACKGROUND

### A. *The Parties*

Plaintiff Carteret Savings Bank, FA ("Carteret") is one of the largest savings and loan associations in New Jersey. (Plaintiff's Br. at 5; O'Brien[1] Aff., ¶¶ 4–6). Carteret converted, in 1982, to a federally chartered mutual association. In 1983, it converted to a federally chartered stock association. Its shares were publicly traded until 1986, and are presently owned by Carteret Bancorp, which is in turn owned by AmBase Corporation, whose shares are publicly traded.

Defendant Office of Thrift Supervision ("OTS") is the successor in interest to the Federal Home Loan Bank Board ("FHLBB"), which had worked in conjunction with the Federal Deposit Insurance Corporation's ("FDIC") predecessor, Federal Savings and Loan Insurance Corporation ("FSLIC"). FHLBB was charged with regulating and supervising federally chartered thrift institutions, acting as the operating head of FSLIC, and enforcing compliance by such institutions with various banking regulations, particularly the regulatory capital (or "net worth") requirements. Home Owners' Loan Act of 1933, Pub.L. No. 101–73, § 301, 83 Stat. 277 ("HOLA," codified as amended at 12 U.S.C. §§ 1461– 1468c). FHLBB was also authorized to appoint FSLIC as conservator or receiver for an insolvent thrift, 12 U.S.C.

§ 1464(d)(6), and to prescribe rules for the liquidation of such thrifts under the circumstances provided in the statute and applicable regulations. 12 U.S.C. § 1464(d)(1).

FSLIC was essentially designed to insure deposit accounts of federally chartered thrifts upon compliance with Title IV of the National Housing Act of 1934 ("NHA"), 12 U.S.C. § 1724 *et seq.*, in addition to numerous other assigned duties. One of these duties, however, is particularly important to the present case: FSLIC was authorized to extend assistance to failing thrifts, including the arrangement of mergers with "healthy" thrifts. 12 U.S.C. § 1729(f)(1) (repealed).

Both the FHLBB and FSLIC were abolished by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183, codified at 12 U.S.C. and other titles. OTS was then established and acquired most of the functions of FHLBB. 12 U.S.C. §§ 1462a, 1464. FIRREA also transferred many of FSLIC's functions to the FDIC. 12 U.S.C. §§ 1811, 1814. FIRREA was further amended by the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990, Pub.L. No. 101–647, 104 Stat. 4859 (Nov. 19, 1990), to be codified throughout 12 U.S.C. In addition, FIRREA has been modified by the Technical and Miscellaneous Amendments Act, Pub.L. No. 101–647, 104 Stat. 4906 (Nov. 19, 1990) (collectively, the "1990 Act").

### B. *The Events*

The "S & L crisis" of the late 1970's and early 1980's is well documented. High interest rates and record inflation caused many thrifts which held long-term, low-yield, fixed-rate mortgages to experience operating losses and ultimately fail. The

---

1. Robert B. O'Brien, Jr. is Chairman and Chief Executive Officer ("CEO") of Carteret Bancorp, the parent company of plaintiff Carteret. (O'Brien Aff., ¶ 1). O'Brien also served as CEO of Carteret itself from June 1975 until April 1990, as Chairman of Carteret from September 1981 through the present, and as President of Carteret from June 1975 until September 1981. (*Id.,* ¶ 2). Prior to his employment with Carteret, Mr. O'Brien worked for both FSLIC and FHLBB from 1969 to 1971. (*Id.,* ¶ 3).

government had to act in order to diminish the crisis.

The present litigation revolves around what the government did then. The parties herein tell the story differently, as to what exactly the government did and pursuant to what authority. Carteret describes the events of the 1980's as follows. FHLBB and FSLIC implemented a policy of requiring problem thrifts to merge into healthy institutions, in order to save the cost and cash outlays required to liquidate the failing bank. (Plaintiff's Br. at 8; Faucette [2] Aff., ¶ 6; O'Brien Aff., ¶¶ 8, 9). Despite any possible savings, the cost of the mergers was very high because FSLIC provided supervisory financial assistance to the merging institutions. (Plaintiff's Br. at 8 (citing Beesley [3] Remarks, 3/3/82, at Plaintiff's App., Exh. 6)). These cash outlays were threatening to bankrupt the FSLIC. (Plaintiff's Br. at 9 (citing Beesley Remarks 9/9/82, at Plaintiff's App., Exh. 4)). Therefore, FSLIC promised healthy acquiring institutions that goodwill derived under the purchase method of accounting [4] would count dollar-for-dollar as regulatory capital, for purposes of determining compliance with government standards. (Plaintiff's Br. at 9; Beesley Remarks, 4/13/82 at 6-8, Plaintiff's App., Exh. 5; Pratt [5]

Interview, 11/24/81 at 6-7, Plaintiff's App., Exh. 9).

The latter "promise" represents the crux of the present dispute. OTS asserts, essentially, that the government made no such promise, and even if it did FIRREA overrides it to preclude the use of supervisory goodwill in determining compliance with the capital regulations.

### C. The Relevant Transactions and Related Documents

#### 1. The 1982 Acquisitions

On September 30, 1982, Carteret acquired, under the supervision of FSLIC and FHLBB, two FSLIC-insured failing thrifts. (O'Brien Aff., ¶ 14). One was the First Federal Savings and Loan Association of Delray Beach ("Delray") in Florida, and the other was the Barton Savings and Loan Association ("Barton") of New Jersey. (*Id.*) Carteret received $11.7 million in financial assistance for the acquisition of Barton, but no financial assistance for the acquisition of Delray. (*Id.*) As of the acquisition date, Barton had assets with a fair market value of $126 million and liabilities with a fair market value of $172 million, such that the acquisition left $46 million of goodwill. (*Id.*, ¶ 15). Similarly, Delray had assets with a fair market value of

---

**2.** Douglas P. Faucette is presently a partner in the law firm of Muldoon, Murphy & Faucette. Prior to joining the firm in 1981, he was employed by the FHLBB as Senior Associate General Counsel. Thereafter, in 1982, he and his firm represented First Federal Savings & Loan Association of Delray Beach, one of the failing banks which merged with Carteret. (Faucette Aff., ¶¶ 1, 3). He was later counsel for Carteret in connection with a second acquisition by Carteret in 1982. (*Id.*, ¶ 3).

**3.** H. Brent Beesley was FSLIC Director at the time.

**4.** Generally Accepted Accounting Principles ("GAAP") represent the standard principles and rules that are accepted and applied in practice for general purpose financial reporting. (*See* Lindo Decl., ¶ 2; Arthur W. Lindo is a Senior Accountant with OTS, and is a member of the American Institute of Certified Public Accountants ("AICPA")). Various methods of accounting may be consistent with GAAP, and in fact, different methods may be used for different purposes and still be consistent with GAAP.

The present litigation is primarily concerned with the "purchase method of accounting." This method of accounting is simply that "the acquiring corporation records assets acquired and liabilities assumed at their respective fair values on the date of acquisition. Any excess in the purchase price (including any assumption of liabilities) over the fair value of the sum of the acquired corporation's assets less its liabilities is separately recorded as goodwill." (Lindo Decl., ¶ 4; *see also* Kaplan Aff., ¶ 9; (Donald M. Kaplan is a former economics and finance professor at Harvard University's Graduate School of Business Administration, a former employee of the FHLBB, and is presently head of his consulting and investment banking firm, Kaplan, Smith & Associates; he is testifying as an expert on behalf of the plaintiff Carteret). *See also Franklin Federal Savings Bank, et al. v. Director, OTS, et al.,* 927 F.2d 1332, 1335 (6th Cir.1991)); *First Federal, et al. v. Ryan, et al.,* 927 F.2d 1345, 1349 n. 4 (6th Cir.1991).

**5.** Richard T. Pratt was Chairman of the FHLBB at the time.

$644 million and liabilities valued at $812 million, such that it had $168 million in goodwill. (*Id.*) Thus, the acquisition of these two institutions provided Carteret with $214 million in supervisory goodwill, about 90% of the amounts presently in question. (*Id.*, ¶¶ 15, 16).

Numerous documents were generated as a result of the merger of Delray and Barton into Carteret. The first is a letter from FHLBB Secretary J.J. Finn to Robert O'Brien of Carteret, dated September 30, 1982, which confirms the parties' understanding. (*See* O'Brien Aff., Exh. A (referred to herein as "1982 Forbearance Letter")). This letter was subsequently clarified by letter of the FHLBB dated October 12, 1988. (*See* O'Brien Aff., Exh. B). The second is an "Assistance Agreement" between FSLIC and Carteret, dated September 29, 1982 and signed by the parties on the 29th and 30th of that month. (*See* O'Brien Aff., Exh. C). The third document is FHLBB Resolution No. 82–662, adopted on September 30, 1982, approving the merger. (*See* Faucette Aff., Exh. H). Carteret has also provided the Court with the various bid letters it submitted to FHLBB prior to completion of the transaction. (*See* Faucette Aff., Exhs. D, E, F).

### 2. The 1986 Transactions

On June 6, 1986, Carteret acquired two [6] additional troubled thrifts in another supervisory merger. One is the First Federal Savings and Loan Association of Montgomery County ("First Federal"), in Blacksburg, Virginia, and the other is Mountain Security Savings Bank ("MSSB") of Wytheville, Virginia. (O'Brien Aff., ¶ 25). The acquisition of these two thrifts resulted in additional supervisory goodwill in the amount of $22,059,000. (*Id.*) As with the 1982 acquisitions, this transaction generated various documents: FHLBB Resolution No. 86–566 (Blanco [7] Aff., Exh.

D); an Acquisition Agreement between FSLIC and Carteret (*id.*, Exh. E); an Assistance Agreement between FSLIC and Carteret (*id.*, Exh. F); and various revised bid letters to FSLIC and FHLBB from Carteret (Blanco Aff., Exhs. A, B, C).

Carteret contends that the documents for each transaction constitute a binding contract, permitting it to use supervisory goodwill in determining whether it has met its regulatory requirements.

### D. FIRREA

FIRREA sharply curtailed the use of supervisory goodwill in determining whether regulatory capital requirements are met. Amortization of supervisory goodwill is limited to 20 years. 12 U.S.C. § 1464(t)(9)(B). In addition, its use to calculate "core capital," an accounting category that now must amount to no more than three percent of the institution's total asset base, is being phased out. 12 U.S.C. § 1464(t)(2)(A). By January 1, 1995, supervisory goodwill cannot be used at all to calculate core capital. 12 U.S.C. § 1464(t)(3)(A).

At the same time, FIRREA has strengthened the capital standards which savings associations must meet. Specifically, "[t]he Director [of OTS] shall, by regulation, prescribe and maintain uniformly applicable capital standards for savings associations. Those standards shall include (i) a leverage limit; (ii) a tangible capital requirement; and (iii) a risk-based capital requirement." 12 U.S.C. § 1464(t)(1)(A). All three of these standards must be met. 12 U.S.C. § 1464(t)(1)(B).

The OTS, the agency charged with enforcing FIRREA, has interpreted its requirements as applying to all thrifts not specifically exempted by FIRREA. Accordingly, on January 9, 1990, OTS issued "Thrift Bulletin 38–2" which prohibits the use of supervisory goodwill in determining

---

**6.** In the same transaction, Carteret acquired a third bank, Admiral–Builders Savings and Loan Association in Parkville, Maryland. (O'Brien Aff., ¶ 25). However, the acquisition of Admiral does not account for any of the supervisory goodwill in this case, and so will not be discussed any further. (*Id.* at ¶ 26).

**7.** Debra L. Blanco is Assistant Secretary of Carteret, with responsibility for maintenance of Carteret's records. Her affidavit therefore attests to the accuracy of these records.

whether a savings association is in capital compliance, regardless of any previous forbearances issued. Thus, argues OTS, even if Carteret had an otherwise enforceable contract to use supervisory goodwill to meet capital requirements, this contract has been abrogated by the statute and is therefore no longer enforceable.

## E. Recent Events

In June and December 1990, OTS prepared an examination report of Carteret. (Walsh[8] Aff., ¶ 30). In that report, the regulators did not include Carteret's supervisory goodwill as regulatory capital in calculating Carteret's compliance, consistent with its position. (*Id.*) Thus, Carteret was declared out of compliance, and all of the consequences thereof contained in FIRREA began. These consequences include a prohibition against asset growth and a requirement that Carteret comply with a capital directive issued by OTS. 12 U.S.C. § 1464(t)(6). Thus, on February 4, 1991, OTS Assistant Director Joseph Kehoe sent Carteret a "Stipulation and Consent to the Issuance of a Capital Directive," with instructions to adopt it by February 28, 1991. (*See* Walsh Aff., Exh. B). The Capital Directive contains a wide variety of requirements with which Carteret must comply, many of which are extreme. The overall effect of these requirements is substantial governmental control of and/or intervention in even the most basic day-to-day operation of the plaintiff. Furthermore, although this Directive appears to seek consent before it will be imposed, it is evident that failure to consent results in its imposition, without consent.

The sole basis of OTS' action is Carteret's failure to meet capital requirements (specifically, the risk-based capital requirements), and the only reason it does not meet them is because OTS does not count the supervisory goodwill in making its determination. If Carteret was able to use that goodwill, it would be in capital compliance. No other basis for regulatory action against Carteret is asserted.

Based on these events, Carteret filed a seven-count complaint. Count One asserts that defendants' failure to recognize Carteret's supervisory goodwill is an action in excess of its statutory authority and is in violation of § 401(f), (g) and (h) of FIRREA (found at 12 U.S.C. § 1437 note (1990)). Count Two states that the actions of the defendants constitute a violation of the Administrative Procedure Act ("APA"). Count Three seeks a declaratory judgment that FIRREA cannot and did not abrogate plaintiff's alleged contracts with defendants' predecessors. Count Four asserts that the defendants are estopped from prohibiting the use of goodwill as a result of their actions and Carteret's reliance thereon. Count Five asserts that plaintiff's contractual right to use goodwill is property protected by the fifth amendment, so that OTS' restriction on its use violates the fifth amendment and Carteret's right to due process of law. Count Six seeks reformation of the contract to provide plaintiff with cash or assets in the amount that it should have received as consideration under the parties' contracts. Finally, Count Seven asserts a claim against OTS and FDIC for breach of the contracts entered into by FHLBB and FSLIC. Carteret therefore seeks numerous forms of equitable relief and declaratory judgments.

On the same day it filed its complaint, Carteret also sought a temporary restraining order ("TRO") against the OTS. After oral argument was heard on February 15, 1991, this Court issued a TRO restraining OTS from taking any action against Carteret based on a determination that supervisory goodwill cannot be used. The Court also set the matter down for a preliminary injunction hearing, which was held on April 12, 1991, resulting in the present opinion.

## II. DISCUSSION

### A. JURISDICTION AND RIPENESS

█ In the February 18, 1991 oral opinion, this Court stated that it had jurisdiction as follows:

---

**8.** Robert C. Walsh is the current President and CEO of Carteret, and a member of its Board of Directors. (Walsh Aff., ¶ 1). Prior to assuming positions as President and CEO in 1989–1990, he was President of Carteret's mortgage banking operation and then Chief Financial Office of Carteret. (*Id.*, ¶¶ 2–4).

The Court determines, first, that it does have jurisdiction on at least two bases. The first under the Administrative Procedure Act, 5 U.S.C. Sections 702 and 706 as elaborated by Judge Rodriguez in the *Hansen [Savings Bank, et al. v. Office of Thrift Supervision* [758 F.Supp. 240], No. 90–4092, slip op. (D.N.J. January 30, 1991)] case and also pursuant to the expressed directive of 12 U.S.C. § 1464(d)(1) as several other courts with similar cases have held.

The Court specifically finds, at least at this juncture of the case, the defendants have not persuaded the Court that the Tucker Act or comparable remedies which the plaintiff might have before the Court of [C]laims are exclusive.

(Tr. of Op. on Order to Show Cause, February 18, 1991 at 3). This Court specifically reiterates those findings and supplements them as follows.

As indicted above, the OTS has issued Thrift Bulletin 38–2 which states:

The Office of Thrift Supervision is applying the new capital standards to all savings associations, including those associations, that have been operating under previously granted capital and accounting forbearances. *Section 5(t) of HOLA as amended by [FIRREA] eliminates these forbearances. All savings associations presently operating with these forbearances, therefore, should eliminate them in determining whether or not they comply with the new minimum regulatory capital standards.* (Any FSLIC capital contributions that resulted in the creation of goodwill will be subject to the requirements for goodwill established in the capital regulation). If the association determines that it will fail its minimum regulatory capital requirements upon the elimination of capital and accounting forbearances, it must submit a capital plan ... in accordance with the regulatory capital regulation and Thrift Bulletin 36.

A capital plan will not be acceptable if it includes the continuation of previously granted capital and accounting forbearances. Capital plans already submitted that propose to continue previous capital and accounting forbearances will be either disapproved, returned for revision and resubmittal or conditionally approved with the requested forbearances denied.

(Plaintiff's App. to Compl., Exh. 15) (emphasis added). This bulletin is a final agency action within the meaning of APA § 2(c), 5 U.S.C. § 551(4), and is ripe for judicial review. *See Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Other federal courts have reached the same result. *See e.g. Hansen Savings Bank, et al. v. Office of Thrift Supervision,* 758 F.Supp. 240, 243 (D.N.J.1991); *Franklin Federal Savings Bank, et al. v. Director, Office of Thrift Supervision,* 927 F.2d 1332, 1337 (6th Cir. 1991).

■ With respect to the FDIC, however, this Court reiterates its view expressed from the bench on February 18, 1991, that plaintiff's claims against it are not ripe. The comments of the Sixth Circuit are particularly on point here:

While we conclude that the suit against the OTS is sufficiently ripe, the claim against the FDIC is a different story. The FDIC has, so far as we can tell, taken no action that has had any effect whatsoever on the plaintiff. The only thing that the FDIC might be able to do to [the plaintiff] would be to revoke its insurance coverage. If it were to do that, however, [the plaintiff] would be entitled to an adversary hearing prior to the termination of its insurance. 12 U.S.C. § 1818(a)(2) & (3). That determination would then be subject to appellate review in accordance with the provisions of the Administrative Procedure Act. 12 U.S.C. § 1818(h)(2). Thus, we conclude that the claim against the FDIC is not ripe for review.

*Franklin Federal,* 927 F.2d at 1338. This Court agrees with this analysis and, therefore, finds that plaintiff's present claims against the FDIC herein are not ripe for review. The Court understands that the FDIC has been named as a defendant in part because it is the successor to FSLIC, a party to the contracts in question. On that

basis, FDIC remains a viable defendant for purposes of plaintiff's complaint.

█ The second basis for jurisdiction in this Court is 12 U.S.C. § 1464(d)(1)(A) which provides that the Director of OTS is subject to suit, other than suits on claims for money damages.[9] Thus, sovereign immunity has been waived as to that federal agency and this Court has jurisdiction.

█ The parties, subsequent to this Court's previously quoted oral opinion, have argued at length whether this Court has jurisdiction to hear plaintiff's "taking" and contract claims. Essentially, defendants argue that these claims are within the exclusive jurisdiction of the Claims Court as a result of the Tucker Act, 28 U.S.C. § 1491. The relevant portion of the Tucker Act reads as follows:

> (a)(1) The United States Claims Court shall have jurisdiction to render judgment upon *any claim against the United States* founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, *or upon any express or implied contract with the United States*, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

> \* \* \* \* \* \*

> (3) To afford complete relief on any contract claim brought before the contract is awarded, the court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper, including but not limited to injunctive relief. In exercising this jurisdiction, the court shall give due regard to the interests of national defense and national security.

28 U.S.C. § 1491(a)(1), (3) (emphasis added).

Several courts have considered whether supervisory goodwill cases, based on contracts with the FHLBB and FSLIC, are properly brought only under the Tucker Act. The cases are not uniform.

In *Far West Federal Bank, S.B. v. Dir. Office of Thrift Supervision*, 744 F.Supp. 233 (D.Or.1990), the court considered, on the government's motion to dismiss, Claims Court jurisdiction over the bank's rescission and fifth amendment "taking" claims. As a threshold issue, the court found that the action before it (which was nearly identical to the case at bar) was in fact an action against the sovereign. (*Id.* at 237 (citing *Land v. Dollar*, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949)). Specifically, the court found that "[i]f plaintiffs receive a judgment of restitution, it would expend itself on the public treasury. If they receive permanent injunctive relief or declaratory relief, it would restrain the government from acting." (*Id.*) The next question for the court was whether the sovereign had waived its immunity with respect to the action, and the court determined that it had, in FIRREA. (*Id.; see* 12 U.S.C. § 1464(d)(1)(A) and 12 U.S.C. § 1819)). These waivers apply only to actions seeking other than money damages, and therefore the court had to determine the nature of the damages sought. (*Id.* at 238). Although plaintiff sought restitution, an amount measured in dollars, the court nonetheless concluded these were not money damages because "[t]hey are not based on allegations [sic] damages from a *breach* of contract by a contracting party, but rather restitution for the *abrogation* of the entire contract by congressional action." (*Id.*) (Emphasis in original). Thus, the court determined that it had subject matter jurisdiction.

Prior to the motion resulting in the above opinion, the *Far West* court had also denied the government's motion to sever and transfer the bank's Count IV (for re-

---

9. Similarly, the FDIC is subject to suit pursuant to 12 U.S.C. § 1819.

scission) to the Claims Court.[10] (*Id.* at 235). The government appealed this ruling[11] to the Federal Circuit.[12] This appeal raised the identical issues addressed by the district court: governmental immunity from suit and grant of subject matter jurisdiction to the district court. *Far West Federal, et al. v. Dir. Office of Thrift Supervision, et al.*, 930 F.2d 883, 887 (Fed.Cir. 1991). The Federal Circuit considered FIRREA's waivers of immunity for the two agencies and determined that it provided the district court with jurisdiction. (*Id.* at 888–89, 890–92). The second consideration for the court was the source of any funds which the plaintiff bank would recover as restitution. The court held that under FIRREA, 12 U.S.C. § 1821a(d),[13] funds would come from the agency, not the Treasury, and therefore Tucker Act jurisdiction was not implicated. (*Id.* at 890). Thus, the Federal Circuit affirmed the district court's order refusing to transfer this claim to the Claims Court. *See also Guaranty Financial Services, Inc. v. Office of Thrift Supervision*, 742 F.Supp. 1159, 1161 (M.D.Ga. 1990), *rev'd on other grounds*, 928 F.2d 994 (11th Cir.1991) (district court determined that it had jurisdiction despite the Tucker Act, in light of explicit waiver in FIRREA); *Flagship Federal Savings Bank, et al. v. M. Danny Wall, Director, et al.*, No. 90–0079, slip op. at 5 (S.D.Cal., February 14, 1990) (same).

In contrast, the district court in *Olympic Federal Savings and Loan Association v. Director, Office of Thrift Supervision, et al.*, No. 90–4082, 1990 WL 134841 (D.D.C., September 6, 1990), dismissed the bank's breach of contract claims. There, the court reviewed the Tucker Act and determined that the action before it was within its confines. (Slip op. at 18). Furthermore, the court found that the APA did not provide for a waiver of the sovereign's immunity. (*Id.*) The *Olympic Federal* case is distinguishable from *Guaranty* and *Far West*, however, because in *Olympic*, the plaintiff "readily admits" that its suit is against the United States. (*Id.* at 11). Therefore, the provisions of FIRREA providing for suit against OTS and FDIC were not pressed.

The *Olympic* decision is distinguishable from the present case as well. Here, plaintiff's suit is against OTS and FDIC, not the United States. Furthermore, the relief sought in Carteret's complaint is not money damages, and therefore the jurisdictional sections of FIRREA apply. (*See Far West*, 930 F.2d 883 (Fed.Cir.1991)). Thus, it appears that the present suit is properly before this Court in all respects.

As a final note, this Court recognizes that the present matter is before it on the basis of a preliminary injunction, not a motion to dismiss or a motion for summary judgment. Therefore, it is sufficient to recognize that this Court has jurisdiction over at least plaintiff's FIRREA claims such that it can entertain the present motion.

### B. Standards Governing Preliminary Injunctions

The standards governing preliminary injunctions have been articulated in this Circuit as follows:

> In considering a motion for preliminary injunctive relief, a court must carefully weigh four factors: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the

---

**10.** The motion had also gone to Count V, the "takings" claim, but by the time it reached the Federal Circuit, the plaintiff had voluntarily agreed to transfer that claim to the Claims Court.

**11.** The government has also appealed various other rulings and opinions in that case. Counsel for the government herein represented to this Court that the Ninth Circuit has already heard oral argument on various other portions of the case, but has not yet issued a decision.

**12.** Under 28 U.S.C. § 1292(d)(4)(A), all appeals of the grant or denial of a motion to transfer an action to the Claims Court are assigned to the Federal Circuit.

**13.** Title 12 U.S.C. § 1821a(d) provides that any judgment obtained against FSLIC or FDIC as its successor shall be limited to the assets of the FSLIC Resolution Fund. The court held that 12 U.S.C. § 1821a(c)(1), providing for Treasury payments to FSLIC when necessary for the fund, did not affect this jurisdiction.

movant will be irreparably injured by denial of such relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting preliminary relief will be in the public interest.

*SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir.1985); *see also Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 197–98 (3d Cir.1990); *Klitzman, Klitzman and Gallagher v. Krut*, 744 F.2d 955, 958–59 (3d Cir.1984); *Continental Group v. Amoco Chemicals Corp.*, 614 F.2d 351, 356–57 (3d Cir.1980). Preserving the status quo of an action pending final determination is the primary purpose of a preliminary injunction. *In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1150 (3d Cir.1982). A plaintiff must establish both items (1) and (2) above in order to obtain a preliminary injunction. *Morton v. Beyer*, 822 F.2d 364, 367 (3d Cir.1987).

## C. Reasonable Probability of Success on the Merits

This Court finds that there are two general theories which should be addressed. The first concerns whether Carteret's agreements with FSLIC and FHLBB are enforceable contracts and, if so, whether FIRREA abrogates or preserves them.[14] The second is Carteret's fifth amendment "takings" argument.[15]

### 1. Statutory Argument

There are two issues which are relevant to Carteret's probability of success on the merits under this theory. The first is whether the documents generated in its supervisory acquisitions constitute a binding contract. The second issue is whether FIRREA preserves or abrogates those contracts. Complicating the latter is the question of the appropriate amount of deference to be given to agency interpretation of the statute.

### a. Existence of Contractual Forbearances

Both the 1982 and 1986 Assistance Agreements between Carteret and FSLIC state that the agreement and the parties' rights and obligations thereunder are to be governed by the law of New Jersey to the extent that federal law does not control. (1982 Assistance Agreement, § 19, attached as Exh. C to O'Brien Aff.; 1986 Assistance Agreement, § 22, attached as Exh. F to Blanco Aff.). Therefore, the law applicable here is the same as that set out in *Hansen*, 758 F.Supp. at 244–45:

> To the extent that this contract must be interpreted, New Jersey law will apply. *See Kalman Floor Co. v. Jos. L. Muscarelle, Inc.*, 196 N.J.Super. 16, 481 A.2d 553 (App.Div.1984).
>
> New Jersey law provides "that two or more writings which are all parts [sic] of one transaction relating to the same subject matter, are to be read and interpreted as one instrument, whether or not they refer to each other." *Wellmore Builders, Inc. v. Wannier*, 49 N.J.Super. 456, 463, 140 A.2d 422, 426 (App.Div. 1958). *See also Lawrence v. Tandy & Allen*, 14 N.J. 1, 100 A.2d 891 (1953) ("[t]he writing alone is not 'wholly and intrinsically self-determinative of the parties' intent to make it the sole memorial."). The Third Circuit Court of Appeals has appropriately noted that construing contemporaneous documents is only done when the parties intended such a result. *See Berger v. United States Fidelity & Guaranty Co.*, 834 F.2d 1154, 1161 (3d Cir.1987) ("Only where the documentary proof may be fairly read to indicate that all parties agreed upon the modification of one document will [the court construe the contemporaneous documents together]").

Contrary to the government's position at oral argument, there is no substantial difference between these principles and those governing interpretation of contracts under general federal law. Therefore, this Court will apply the above standards in determin-

---

**14.** This discussion is raised in Counts I, II and III of the plaintiff's complaint.

**15.** This discussion is raised by Count V of the plaintiff's complaint.

ing whether the parties have a valid contract for the use of supervisory goodwill to determine capital compliance.

### i. The 1982 Transaction

The relevant portions of the documents are as follows. The 1982 forbearance letter expressly states:

> Provided that Carteret submits to the Principal or other Supervisory Agent of the [FHLBB], New York, New York, certification by Carteret's independent accountants that Carteret has accounted for the assets and liabilities acquired in the Mergers, and the resulting periods for the amortization of goodwill and the accretion of the loan discount, in accordance with generally accepted accounting principles ("GAAP"), as GAAP existed at the time of the [FHLBB's] approval of the Mergers, *such certification shall be considered to be satisfactory evidence that Carteret's use of the purchase method of accounting is in accordance with GAAP, and such use of the purchase method of accounting will be considered to be in accordance with regulatory accounting procedures.*

(1982 Forbearance Letter, ¶ 10, attached as Exh. A to O'Brien Aff.) (emphasis added). The certification of an accountant was provided, making it clear that the applicable period of amortization was not to exceed 40 years. (*See* Faucette Aff., Exh. G, letter of Peat, Marwick dated September 29, 1982; Accounting Principles Board ("APB") Opinion 17, ¶¶ 27–31, attached as Exh. C [16] to Winning Decl.). The forbearance letter is dated September 30, 1982, the same date as the merger, and specifically refers to the related Assistance Agreement and the FHLBB's resolution approving the merger. (*Id.* at opening, ¶ 9).

The last sentence of the letter reserved to FHLBB "all of their statutory rights and privileges with respect to Carteret." (*Id.*) Accordingly, counsel for Carteret sought and acquired clarification of this reservation. On October 12, 1982, the FHLBB stated that the last sentence should read:

> Other than actions to enforce the regulatory requirements waived in accordance with paragraphs 1 through 10 and the statutory provisions authorizing imposition of the waived requirements, insofar as such requirements are waived, the [FHLBB] and the FSLIC expressly reserve all of their statutory rights and privileges with respect to Carteret.

(Letter of October 12, 1982, attached as Exh. B to O'Brien Aff.).

The Assistance Agreement's recitals specifically refer to the mergers and note that a condition to the obligation of the parties to consummate the merger is the Assistance Agreement. (O'Brien Aff., Exh. C at 1; *see also* "§ 14 Conditions" at 34). The Assistance Agreement also conditioned FSLIC's obligations on various events, all of which have been met. (*Id.* at 35). The Agreement also contains an integration clause:

> **§ 17 *Entire Agreement, Modification, Headings***
>
> This Agreement, *together with any interpretation thereof or understanding agreed to in writing by the parties*, constitutes the entire agreement between the parties hereto and supersedes all prior agreements and understandings of the parties in connection herewith, *excepting only the Merger Agreement and any resolutions or letters issued contemporaneously herewith by the Federal Home Loan Bank Board or [FSLIC]*, provided, however, that in the event of any conflict, variance, or inconsistency between this Agreement and the Merger Agreement, the provisions of this Agreement shall govern and be binding on all parties insofar as the rights, privileges, duties, obligations, and liabilities of [FSLIC] are concerned.
>
> No modification of this Agreement shall be binding unless executed in writing by the parties hereto or their successors. Sections headings are not to be considered part of this Agreement, are solely for the convenience of reference, and

---

**16.** The attachments to this declaration were not consecutively numbered, and so the Court had to impose its own sequence of designations for

easy reference. Therefore, the exhibits range from A to J.

shall not affect the meaning or interpretation of this Agreement or any provision hereof.

(*Id.* at 36–37) (emphasis added).

The specified purpose of the Agreement is to provide a means to prevent the failure of the merging thrifts, protect depositors, creditors and the community from losses, as well as limit expenses of FSLIC. (*Id.,* § 20 at 37). Furthermore, the Agreement was entered into so that Carteret "may receive the benefits and assume the risks contracted for," and while it could expect certain business risks, "it is intended that the purpose of this Agreement be accomplished without imposing an unreasonable financial burden" upon Carteret. (*Id.* at 37–38). Thus, "[t]he parties therefore agree that they shall in good faith, and with their best efforts, cooperate with one another to carry out the purposes of this Agreement as described herein." (*Id.* at 38).

Finally, FHLBB's Resolution No. 82–662 approving the transaction specifically recites that one consideration for the resolution is the merger in question, which is conditioned upon the execution of the Assistance Agreement. (Faucette Aff., Exh. H at 1). The resolution also states that the merger is itself conditioned upon FHLBB approval. (*Id.*) Most importantly for Carteret, the resolution contains the following language:

[IT IS] RESOLVED FURTHER, That the mergers shall be accounted for using the purchase method of accounting in accordance with generally accepted accounting principles ("GAAP"); and
RESOLVED FURTHER, That certification by Carteret's independent accountants that Carteret has accounted for the mergers in accordance with GAAP shall be considered satisfactory evidence that said purchase method of accounting is in accordance with GAAP.

(*Id.* at 3).

Review of these various provisions, as well as a reading of the entire documents together, shows that the parties intended the entire agreement to include the terms relating to purchase method accounting in the forbearance letter and the resolution. Each of the documents refers to the others and in fact makes execution of several of them conditioned upon execution of the others. The integration clause in the Assistance Agreement specifically incorporates contemporaneous resolutions and other writings between the parties, thus expressly including the forbearance letter and Resolution 82–662. Therefore, the clear intent of the documents was to create together an agreement that Carteret could use the purchase method of accounting, and that this constituted one of the benefits for which Carteret bargained.

This Court finds further support for this interpretation in additional evidence provided by Carteret. For example, each of three bids sent to the FHLBB specifically requested a binding commitment permitting Carteret to use the purchase method and amortize goodwill over 40 years, using the straight-line method. (*See* Exhs. D, E and F to Faucette Aff.). Furthermore, counsel involved in the transaction avows that this commitment was an express condition of the transaction. (Faucette Aff., ¶ 13). Carteret's CEO at the time, Robert O'Brien, asserts that "Carteret could not have done the Delray and Barton acquisitions without booking supervisory goodwill as capital for regulatory purposes, or, in the alternative, receiving massive government financial assistance." (O'Brien Aff., ¶¶ 18, 20). In fact, O'Brien states, without the commitment "we would have accumulated a capital deficit so deep that we would have had no chance of survival ... [and] the regulators would never have permitted Carteret to create such a deficit." (*Id.,* ¶ 19).

Finally, Carteret has obtained an affidavit from Michael Horn, an attorney who was Commissioner of Banking in New Jersey at the time, and whose approval was required because Barton was a state chartered institution. (Horn Aff., ¶¶ 1, 9; Horn Dep. at 7, 19, attached as Exh. 2 to Plaintiff's App. in Reply). Mr. Horn states that he "would not have approved this acquisition as in the public interest without the understanding, which I held at the time,

that Carteret held a right fixed by contract to count as regulatory capital the value of supervisory goodwill recorded in the Merger." (Horn Aff., ¶ 9). Mr. Horn also testified that this contractual term was common in the industry, and was an important element to induce solvent institutions to acquire insolvent ones without the necessity of cash outlays by the government. (*Id.* at ¶ 12).

Despite this overwhelming evidence to the contrary, OTS argues that Carteret did not have a binding contract with FSLIC and FHLBB. OTS claims that the documents do not refer to "supervisory goodwill" for regulatory purposes, and in fact "do not even mention the term goodwill." (Defendant's Br. at 46). Instead, the documents refer only to a method of accounting (the purchase method), not what assets can be used to meet regulatory requirements. (*Id.* at 47). Not only is this argument completely devoid of merit, it is factually incorrect. As quoted above, the forbearance letter, which is a part of the entire agreement between the parties, specifically refers to amortization of goodwill. Secondly, by OTS' own accountant's declaration, the purchase method of accounting *is* determining goodwill as an asset, and amortizing it over time. (*See* Lindo Decl., ¶¶ 4–6; *see also* n. 4 *supra* ).

OTS also claims that methods of computation apply only for purposes of the Assistance Agreement according to the section entitled "Accounting Principles", thus undercutting plaintiff's theory. (*Id.*, referring to § 13). This Court's determination did not rest on this portion of the Assistance Agreement, but upon the Agreement as a whole and the integration clause in particular. Thus, this clause in the Agreement is not applicable.

The government also argues that by its own terms, the Assistance Agreement terminates three years after its effective date. (*Id.* at 47–48, referring to § 1(a)). This does not alter this Court's finding that

there is a binding contract with respect to supervisory goodwill, because § 13 begins "except as otherwise specifically provided." The purchase method of accounting provided for does not contain any limitation of time, but instead refers simply to the method as it is applied under GAAP. Thus, the termination of the Agreement does not affect this provision at all.

OTS also states, in a conclusory fashion, that the Assistance Agreement did not bind the FHLBB (as opposed to the FSLIC) and therefore it is not bound as FHLBB's successor, only FDIC (FSLIC's successor) would be bound in any event. (Defendant's Br. at 48 n. 32). This statement is incorrect. The agreement between the parties is not just the Assistance Agreement; it includes the Board's resolution and forbearance letter. Therefore, it is equally binding on OTS and FDIC.

Finally, OTS argues that none of the documents permits Carteret to use goodwill to meet regulatory requirements. The forbearance letter is not itself a contract, they claim, relying on *Flagship Federal Savings Bank v. Director, OTS,* 748 F.Supp. 742 (S.D.Cal.1990). In *Flagship*, the court determined that the forbearance letters and resolutions in question did not constitute a contract. (*Id.*, at 748). That case is distinguishable, because *Flagship* did not involve an Assistance Agreement, only a forbearance letter and resolution. Thus, nowhere did the parties bargain for various benefits and memorialize them in a series of documents referring to each other, as they did here.

The parties have also presented competing arguments and affidavits on the question of Carteret's financial stability prior to entering the 1982 transaction. Defendants are arguing, as far as it can be determined, that Carteret obtained benefits from the acquisition, including the improvement of its financial stability. (*See* Defendant's Br. at 13–16, 56–57; Winning [17] Decl. with attachments). This argument really begs the

---

**17.** James C. Winning is employed by the OTS as a Regional Coordinator for the Northeast Region, and has been since December 1990. (Winning Decl., ¶ 2). Prior to that time, he worked as a financial analyst with FHLBB and then

OTS, and for the State of Florida. (*Id.*, ¶¶ 3–5). Mr. Winning has prepared projections purporting to demonstrate Carteret's inevitable insolvency absent the 1982 acquisitions.

question. Carteret was under no obligation to help out the FHLBB and FSLIC by acquiring Delray and Barton. As the Assistance Agreement recognized (*see* purposes, quoted above), Carteret entered the Agreement in part to acquire the stated benefits of the transaction. This is as it should be; if there was no benefit to Carteret, it would not have entered into and the government most likely would not have approved the transaction.

### ii. The 1986 Transaction

This Court finds that the 1986 transaction constitutes a second agreement between the parties to utilize the purchase method of accounting, for any and all purposes. The documents relating to the transaction are nearly identical to those promulgated in the 1982 transaction, including the many references to each other and an integration clause specifically including resolutions and other contemporaneous written agreements. Furthermore, defendants make no [18] arguments which are not similarly without merit concerning the 1986 transaction.

Thus, Carteret has shown that it has a reasonable probability of success on the merits of its claim that it is contractually entitled to utilize supervisory goodwill to meet regulatory requirements.

OTS makes a lengthy argument to the effect that even if Carteret had a contract to use supervisory goodwill, it cannot have a contract right to be exempt from congressional changes in the law. (Defendant's Br. at 60–63 (relying on *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986))). This reliance is misplaced. *Bowen* was primarily concerned with the question of whether a statute could create a contractual right such that amendment of the statute to abrogate

that right would constitute a taking under the fifth amendment. The Court determined that no such contract was created, primarily because Congress reserved to itself, in the originally applicable statute, the right to alter, amend, or repeal any provisions of that statute. 477 U.S. at 51–52, 106 S.Ct. at 2396–97. Contrary to OTS' position, however, Carteret is not saying that Congress either created the contract by statute or has contracted away its right to legislate. Instead, Carteret primarily argues that even if Congress does have the right to abrogate or alter these contracts,[19] it has not exercised it in FIRREA. This Court agrees with Carteret, as is discussed below.

### b. The Effect of FIRREA on the Contracts

■ As indicated above, the OTS, charged with enforcing FIRREA, has interpreted its provisions to abrogate all forbearances previously granted such that the new, stricter requirements apply without the use of supervisory goodwill except as specifically provided. (*See* OTS Bulletin 38–2).

It should be made clear at this point that Carteret does not argue that it is exempt from these new requirements. Rather, it simply argues that in determining its compliance with them, it is entitled to use supervisory goodwill as an asset. (*See* Plaintiff's Reply Br. at 4). In fact, Carteret has provided considerable evidence showing its recent efforts to meet the new, stricter requirements by improving its financial condition, introducing a new management team in November 1989 and developing a business plan designed to foster capital strength. (*See generally* Walsh Aff. and Exh. A thereto).

The basis for OTS' interpretation, embodied in OTS Bulletin 38–2, is the language in

---

**18.** OTS asserts that the 1986 forbearance letter does not specifically mention "goodwill." This Court cannot evaluate the merit of this argument because neither party has provided the Court with a copy of the letter. This evidentiary failure has no effect on the Court's determination, however, because Resolution No. 86–566 specifically refers to goodwill. (*See* Blanco Aff., Exh. D at 17). Even if this were a fatal flaw

with respect to the 1986 transaction, it affects plaintiff's case little because 90% of the goodwill in question arose from the 1982 transaction.

**19.** As noted earlier, Carteret also argues that this right to legislate, if exercised, constitutes a fifth amendment taking, for which it is entitled to compensation.

FIRREA § 301, 12 U.S.C. § 1464. Specifically, § 1464(s) and (t) provides, in relevant part:

> (s) **Minimum capital requirements.** (1) In general. Consistent with the purposes of section 908 of the International Lending Supervision Act of 1983 [12 U.S.C. § 3907] and the capital requirements established pursuant to such section by the appropriate Federal banking agencies (as defined in section 903(1) of such Act [12 U.S.C. § 3902(a) ] ), the *Director [of OTS] shall require all savings associations to achieve and maintain adequate capital* by—
>
> (A) establishing minimum levels of capital for savings associations; and
>
> (B) using such other methods as the Director deems appropriate.
>
> \* \* \* \* \* \*
>
> (t) **Capital standards.** (1) In general. (A) Requirement for standards to be prescribed. The Director [of OTS] *shall,* by regulation, prescribe and maintain *uniformly applicable capital standards for savings associations.* ...

(Emphasis added). Based primarily on these directives, OTS asserts that FIRREA applies to all savings associations, irrespective of prior forbearances.

Carteret, on the other hand, looks to other portions of FIRREA to support the contention that it specifically preserves contracts like those involved here. The relevant portions of FIRREA are § 401(f), (g) and (h) (12 U.S.C. § 1437 note). Section 401(a), it should be noted, provides for the abolition of both FSLIC and FHLBB, effective on the date of the enactment of FIRREA for FSLIC and 60 days thereafter for FHLBB. Section 401(f)(1) and (g)(1) are the savings provisions upon which much of the present controversy focuses. Thus, they are quoted in full:

Sec. 401. FSLIC and Federal Home Loan Bank Board abolished.

\* \* \* \* \* \*

> (f) **Savings provisions relating to FSLIC.** (1) Existing rights, duties, and obligations not affected. Subsection (a) shall not affect the validity of any right, duty, or obligation of the United States, the Federal Savings and Loan Insurance Corporation, or any other person, which—
>
> (A) arises under or pursuant to any section of title IV of the National Housing Act [12 U.S.C. §§ 1724 et seq.]; and
>
> (B) existed on the day before the date of the enactment of this Act.
>
> \* \* \* \* \* \*
>
> (g) **Savings provisions relating to FHLBB.** (1) Existing rights, duties, and obligations not affected. Subsection (a) shall not affect the validity of any right, duty, or obligation of the United States, the Federal Home Loan Bank Board, or any other person, which—
>
> (A) arises under or pursuant to the Federal Home Loan Bank Act [12 U.S.C. §§ 1421 et seq.], the Home Owners' Loan Act of 1933 [12 U.S.C. §§ 1461 et seq., generally], or any other provision of law applicable with respect to such Board (other than title IV of the National Housing Act) [12 U.S.C. §§ 1724 et seq.], and
>
> (B) existed on the day before the date of enactment of this act.

Carteret argues that its contract is an "obligation" which is not affected by abolition of FSLIC and FHLBB, inasmuch as part (B) makes it clear that abolition of the agencies and enactment of FIRREA are the same. (*See* Plaintiff's Br. at 44–46).[20] OTS, on the other hand, asserts that Carteret's "rights" were not abrogated by § 401(a)'s abolition of FSLIC and FHLBB, but by the other provisions of FIRREA as supplemented by OTS' subsequent interpretations.[21] (Defendant's Br. at 25–30). OTS

---

**20.** Carteret also relies on § 401(h), which refers to preservation of "orders, resolutions, determinations, and regulations." This section is not applicable to the present case, however, because, as this Court already found, Carteret had a valid contract. Therefore, it was an "obligation" of FSLIC, not merely an "order, resolu-

tion, determination [or] regulation." *See e.g.* *Franklin Federal,* 927 F.2d at 1343 (Contie, J., dissenting).

**21.** That is, OTS Bulletin 38–2. The regulations promulgated about the phase-out of goodwill

further argues that § 401, upon which plaintiff relies, is part of Title IV of FIRREA, applying only to administrative matters surrounding FIRREA's enactment.[22] At oral argument, OTS clarified this argument by saying that § 401 saves contracts but § 301 then overrides supervisory goodwill contracts by its terms. Title III includes the substantive provisions of FIRREA and has its own savings provisions, thus precluding the finding that Title IV contains an exception for savings associations with forbearances. (*Id.* at 29–33). Essentially, both sides argue that the language of the statute "clearly" supports their interpretation.

Just in case this Court disagrees with them that the language "clearly" supports their position, each side relies on numerous statutory construction techniques. For example, OTS argues the old rule that mention of one exception implies the exclusion of others. Carteret, on the other hand, argues that "[i]t is hornbook law that implied abrogations of ... contractual rights and obligations are strongly disfavored." (Plaintiff's Br. at 42).

This Court does not find the pertinent statutory language to be as clear as either party argues. While § 301 (12 U.S.C. § 1464) clearly does not provide for any exceptions, § 401(g) purports to save obligations from the abolition of FHLBB, while part (B), rather than saying "existed while the agency existed" says "existed before the date of the enactment of this Act," thus suggesting that abolition of FHLBB and enactment of FIRREA are one and the same. Under this reading, § 401(g) does save the plaintiff's contracts.

On the other hand, § 401(g) could be read to save obligations only from the fact of abolition of FHLBB, and it is not this abolition that abrogates plaintiff's contracts, it is the other provisions of FIRREA. This is another possible construction of the language.

In fact, the parties thoroughly explore a myriad of other possible interpretations of this statute based on all the usual statutory interpretation rules. Furthermore, both sides find substantial support for their respective positions both in the legislative history and in the experience of the judiciary thus far. Indeed the courts have divided over the interpretation of FIRREA even in the short time since it became effective. (*See Guaranty*, 928 F.2d 994, 1003 n. 3 (11th Cir.1991) (listing cases on both sides of the question)).

Before launching into this Court's own interpretation of FIRREA, however, it is important to realize that OTS is the agency specifically authorized to enforce the statute; therefore, its interpretation is entitled to some deference. It is now well settled that

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *see also Huber v. Casablanca Indust.*, 916 F.2d 85, 96–97 (3d Cir.1990) (same) (*petition for cert.* filed January 9, 1991); *West v. Bowen*, 879 F.2d 1122, 1124

---

just copy the schedule in FIRREA § 301(t)(3)(A), 12 U.S.C. § 1464(t)(3)(A).

**22.** The title of this portion of FIRREA reads: "FSLIC and Federal Home Loan Bank Board abolished; transfer of functions, personnel and property. Act Aug. 9, 1989, P.L. 101–73, Title IV, §§ 401–406, 103 Stat. 354."

(3d Cir.1989) (same); *Grocery Town Market, Inc. v. United States,* 848 F.2d 392, 394 (3d Cir.1988) (same); *Wheeler v. Heckler,* 787 F.2d 101, 104 (3d Cir.1986) ("We must defer to [the agency's] construction, as long as it is reasonable and not arbitrary and capricious."); *Pennsylvania v. United States,* 752 F.2d 795, 798 (3d Cir.1984) ("[A] reviewing court must uphold the agency's interpretation if it is reasonable, notwithstanding the court's belief that some other policy was preferable.").

This Court has already determined that the statute in question is ambiguous. The legislative history has had the same success as the statute; the cases are on both sides with respect to whether the legislative history is clear on the question. Thus, the intent of Congress is also ambiguous. Accordingly, the next question is whether OTS' interpretation, that FIRREA abrogates the contract, is reasonable and permissible. As indicated above, it is a possible interpretation based on the language of the statute and traditional rules of statutory construction.

This does not answer the question of reasonableness and permissibility, however. Other considerations are important, particularly in the context of affecting contractual rights and the purposes of FIRREA. Specifically, this Court determines that OTS' interpretation is unreasonable because Congress cannot and indeed, should not, abrogate a contractual right without clearly stating its intent to do so. Secondly, it is clearly not one of the purposes of FIRREA to permit the agency to make an otherwise healthy institution submit to its sanctions, thus jeopardizing the ability of that institution to survive and serve the community. An interpretation which does so is patently unreasonable.

The court's opinion in *Sterling Savings Association v. Ryan, et al.,* 751 F.Supp. 871 (E.D.Wa.1990), *modified* (November 1, 1990, narrowing scope of injunction), is persuasive on the first point.[23] After recognizing the laudable purposes of FIRREA

and the difficult task of saving thrift institutions, the court stated:

> Hard times do indeed call for stern measures. But those measures should not be wholly devoid of all equity, decency, and compliance by the government with its prior agreements. In a somewhat analogous context, Justice Louis Brandeis once wrote:
>
>> Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy....
>
> *Olmstead v. United States,* 277 U.S. 438, 485 [48 S.Ct. 564, 575, 72 L.Ed. 944] (1928) (Brandeis, J., dissenting). Such advice and counsel is equally germane in the realm of contract.... [E]ven assuming the defendants are correct in their assertion that Congress harbored an intent to abrogate binding and enforceable contracts, as it has the power to do, the court must insist that it be evidenced in a forthright and unmistakable manner. Absent a clear mandate to the contrary, the court will require the defendants to honor the contracts entered into between [plaintiff] and the predecessor agencies.

*Sterling,* 751 F.Supp. at 881.

Carteret is correct in saying that "[i]t is hornbook law that implied abrogations of ... contractual rights and obligations are strongly disfavored." (Plaintiff's Br. at 42). For example, in a different context, the Third Circuit recently refused to read a statute to abrogate provisions in a privately negotiated contract without clear language to that effect in the statute. *Ches-*

---

**23.** This Court disagrees with the *Sterling* court, however, about whether FIRREA's language is    clear.

*ter County Intermediate Unit v. Pa. Blue Shield,* 896 F.2d 808, 815 (3d Cir.1990) ("[W]e cannot conclude, without clear statutory support, that Congress intended the [statute] to abrogate such a provision in a privately negotiated contract. We are confident that Congress would not have done so without explicitly so providing."). *See also Bush v. Oceans International,* 621 F.2d 207, 211 n. 4 (5th Cir.1980) ("[A] change in the status quo should not be inferred unless Congress has unmistakably indicated a wish to the contrary.")

*Federal Power Commission v. Niagara Mohawk P. Corp.,* 347 U.S. 239, 252–53, 74 S.Ct. 487, 495–96, 98 L.Ed. 666 (1953), also suggests that in order for Congress to affect rights it must do so explicitly. In that case, there was legislative history tending to support the claim that the statute in question did not affect contract rights, but this history was not dispositive. Rather, the Court demanded that "[t]o convert this Act from a regulatory Act to one automatically abolishing preexisting water rights on a nationwide scale calls for a convincing explanation of that purpose." (*Id.*) This principle applies here as well. The legislative history is clear as to congressional intent to require savings associations to meet more stringent requirements, in order to avoid another S & L crisis, but is not clear as to the treatment of existing contracts regarding the use of supervisory goodwill.[24] The language of the statute is similarly unclear on this point. Before a court will recognize abrogation of contractual rights, statutory language must clearly so state. Therefore, OTS' determination is unreasonable.

This Court's second concern, relating to the avowed purposes of FIRREA, is similarly important. This case constitutes an example of agency discretion gone haywire. Despite operating losses in 1990, Carteret has not exhibited financial instability or poor management; in fact, it has made considerable effort to come into compliance with the new requirements.[25] Despite these facts, however, OTS apparently wants to charge in and micro-regulate the institution because OTS chooses not to honor a valid contract made by its predecessor. The result of OTS' action will be detrimental to Carteret (see below), and therefore to Carteret's depositors and creditors, as well as those taxpayers who fund OTS' actions. Congress surely did not mean to permit OTS to make an apparently healthy bank sick. Therefore, OTS' construction of FIRREA in a way that is virtually certain to produce such a result is inherently unreasonable, and its actions are beyond its authority. Carteret has met its burden of showing a likelihood of success on the merits of its claim.

This Court takes note of the fact that there are two circuit court opinions which provide some support for the government's interpretation of FIRREA. In *Franklin*

---

**24.** As this Court stated in its February 18, 1991 opinion:

> The House floor debate annexed to the government's brief is informative. It certainly indicates that specific amendments allowing retention of supervisory goodwill by those institutions who have acquired failing Thrifts were indeed defeated or, in one instance, withdrawn I believe from the House floor. That history, however, is not sufficiently significant to diminish, at least at this juncture, the Court's conclusion of a likelihood of success on the merits of the statutory claim brought by the plaintiff. One would expect that throughout the recorded debate in both Houses of Congress you could find special sections, special exceptions to general language debated, compromised, adopted in part, rejected in part, what have you.
>
> I don't believe it is wise, however, to look to such events as somehow narrowing the impact of the very clear general language of Section 401. Others in Congress, other than those who participated in the debate or the vote on either the Quillan or Hyde amendments, including those in the Senate who were not involved in that debate, might well have concluded that the general provisions of 401 were the best way to handle this sort of a matter.
>
> Furthermore, specific exclusion from broad remedial legislation, in all likelihood, was not politically feasible or palatable. Another very significant consideration in actions taken by Congress.

(Tr. 5.25–6.24).

**25.** Indeed, at oral argument, the defendants' attorney acknowledged that even without including supervisory goodwill, Carteret would meet both the new tangible and core capital standards; only the bank's risk-based capital would be substandard.

*Federal,* 927 F.2d 1332 (6th Cir.1991), the Sixth Circuit reversed the district court's entry of a permanent injunction preventing application of FIRREA's requirements to the plaintiff bank. The court interpreted § 401(g)(1) of FIRREA in the manner argued by the OTS, limiting its effect "to those obligations that could have been affected by virtue of the abolition of the FSLIC or the FHLBB." (at 1339). The court, after interpreting the statute itself, noted that OTS' interpretation must be reasonable.

This Court disagrees with the position of the Sixth Circuit, and finds that case distinguishable on several grounds. First, the equities in *Franklin Federal* were considerably different than those herein. There, the agreements arose out of a transaction in which a group of investors formed a company for the purpose of obtaining the failed bank. There was no "healthy" acquiring bank that is now losing the benefit of its bargain and being put at great risk as a result. In addition, there was no contract in *Franklin Federal,* unlike the situation here. These considerations no doubt affected the Sixth Circuit's interpretation of the statute and its consideration of whether or not that interpretation was reasonable. Additionally, the Sixth Circuit failed to consider § 401(g)(1)(B), pertaining to agreements existing "before the date of the enactment of" FIRREA. Finally, to the extent that one might find *Franklin Federal* indistinguishable, this Court disagrees with the result and is not bound by the decisions of the Sixth Circuit.

The Eleventh Circuit has also reversed a district court's imposition of a preliminary injunction, asserting that the plaintiff bank did not meet its burden of proving a substantial likelihood of success on the merits of its claim that FIRREA did not abrogate its contract.[26] In that case, however, the contract specifically warned the plaintiff that the relevant regulatory scheme could change to its detriment. The court, therefore, interpreted that contract to mean that the forbearance with respect to goodwill

applied only so long as the rules did not change. *Guaranty,* 928 F.2d 994, 999 (11th Cir.1991). Thus, the court was also able to construe the contract in a manner which did not affect to sovereign's authority to legislate. (*Id.* at 1000–01). The court then considered FIRREA. After determining that it was ambiguous on the question of whether it altered forbearances relating to supervisory goodwill, the court extensively reviewed the legislative history and determined that Congress intended FIRREA to abrogate supervisory goodwill forbearances. (*Id.* at 1006). Thus, that was the end of the consideration since the agencies' interpretation was consistent with this intent. (*Id.*)

For many of the same reasons expressed regarding *Franklin Federal,* this Court is not persuaded by the reasoning in *Guaranty.* Most notably, this Court disagrees with the Eleventh Circuit's reliance on the legislative history. Review of the considerable legislative history presented by the parties herein is simply not as conclusive as the *Guaranty* court suggests. Much of the discussion concerning the proposed Hyde Amendment, for example, was simply about imposition of additional procedures, and had nothing to do with the meaning of FIRREA. Nor does any amount of legislative history overcome the requirement that elimination of contractual rights must be done clearly and unequivocally, a proposition which neither the Sixth nor Eleventh Circuit decisions address. Therefore, this Court will not follow either of these courts' interpretation of FIRREA. It is this Court's finding that Carteret has succeeded in proving a substantial likelihood of success on the merits of its claims based on contractual rights and FIRREA.

### 2. "Takings" Argument

In Count Five of the complaint, Carteret asserts that its contractual right to treat the value of supervisory goodwill as capital for all regulatory purposes constitutes property protected by the fifth amendment, as does the capital itself. (Compl., ¶¶ 106,

---

**26.** The Eleventh Circuit did not have to decide whether the parties had a contract because the documents themselves asserted that the agreement was deemed a contract made under and governed by federal law. *Guaranty,* 928 F.2d 994, 998 (11th Cir.1991).

107). OTS' interpretation of FIRREA constitutes a repudiation and abrogation of plaintiff's contractual and other property rights without just compensation and without due process of law. (*Id.*)

The first question about which the parties vigorously argue is whether this Court has jurisdiction to entertain this claim. The second, related question is whether, even if it has jurisdiction, this Court can impose equitable relief based on this claim.

The fifth amendment provides in relevant part that "private property [shall not] be taken for public use, without just compensation." It "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 314, 107 S.Ct. 2378, 2385, 96 L.Ed.2d 250 (1987). It is designed "not to limit the governmental interference with property rights per se, but rather to secure *compensation* in the event of otherwise proper interferences amounting to a taking." (*Id.* at 315, 107 S.Ct. at 2386) (emphasis in original). It does not require that just compensation be paid in advance or contemporaneously, rather, all that is required is the existence of a " 'reasonable, certain and adequate provision for obtaining compensation' at the time of the taking." *Preseault v. ICC*, 494 U.S. 1, ——, 110 S.Ct. 914, 921, 108 L.Ed.2d 1, 13 (1990) (quoting *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 124–25, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974) (quoting *Cherokee Nation v. Southern Kansas R. Co.*, 135 U.S. 641, 659, 10 S.Ct. 965, 971, 34 L.Ed. 295 (1890))). That is, if "the government has provided an adequate process for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking." (*Id.*, quoting *Williamson County Regional Planning Comm'n*, 473 U.S. 172, 194–95, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985) (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1013, 104 S.Ct. 2862, 2878, 81 L.Ed.2d 815 (1984))).

The Tucker Act provides jurisdiction in the United States Claims Court for any claim against the government to recover damages founded on the Constitution, including a claim for a fifth amendment taking. *Preseault*, 494 U.S. at ——, 110 S.Ct. at 922, 108 L.Ed.2d at 14 (citing 28 U.S.C. § 1491). Thus, the question herein is whether this case is an exception to this general rule because that process is not adequate for the plaintiff. It is clear that in cases where compensation under the Tucker Act is unavailable or inadequate, the plaintiff is entitled to equitable relief even in a United States District Court. *See e.g. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153 (1952) ("[S]eizure and governmental operation of these going businesses were bound to result in many present and future damages of such nature as to be difficult, if not incapable, of measurement," and therefore the district court properly considered constitutional validity); *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1527 (D.C.Cir.1984), *vacated on other grounds*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985) (permitting injunctive remedy where compensation of Tucker Act is completely inadequate).

In the present case, plaintiff has demonstrated that it will suffer irreparable injury without injunctive relief. (*See infra*). More importantly, for this question, plaintiff has also demonstrated that monetary compensation will not adequately address its taking claim. Specifically, this Court recognizes that, without the injunction, the OTS might well appoint a conservator or a receiver for Carteret. If that occurs, it is not likely that the conservator or receiver would then seek compensation for the contractual rights abrogated by FIRREA. Nor is it clear that even if Carteret or a receiver or conservator did seek such compensation, after the fact of regulatory sanctions, adequate relief could be obtained. The extent of the damages, like those in *Youngstown*, will, at best, be extremely difficult to calculate.[27] The sav-

---

**27.** Theoretically the defendants could pay to Carteret in cash the present balance of its super- visory goodwill, dollar-for-dollar. They have demonstrated no inclination to do so, however.

ings and loan industry is subject to much criticism (much of which may be well deserved) which affects even those institutions that do not deserve it. Should OTS go through with its regulatory sanctions, the injury to Carteret in terms of lost business opportunities, withdrawals and damage to its reputation in the community cannot be accurately quantified in money. Accordingly, this Court finds that compensation available under the Tucker Act would not provide plaintiff with adequate relief, and plaintiff has, therefore, established its right to seek injunctive relief in this court.

The next question to consider is whether plaintiff has met its burden of showing a substantial likelihood of success on the merits of its "taking" claim. The fifth amendment prohibits the government from impairing valid contracts, even those of the government, in which there is a property right without just compensation. *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934). Balanced against this rule is the principle that the government, in its sovereign power, may abrogate contracts when it is necessary to do so in the public interest. *Home Bldg. & Loan Assoc. v. Blaisdell*, 290 U.S. 398, 434, 54 S.Ct. 231, 238, 78 L.Ed. 413 (1934). In order for a contract or benefit to constitute a property interest, there must be more than a "unilateral expectation" or "abstract need." There must be a legitimate claim of entitlement. *Ruckelshaus*, 467 U.S. at 1005–6, 104 S.Ct. at 2874; *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

In the present case, this Court has already determined that Carteret had a contract with the government to use its supervisory goodwill for regulatory purposes. This contract right was created as a result of a bargained exchange and, therefore, is more than a "unilateral expectation" or "abstract need." Carteret alleviated the government's obligation of bailing out the four thrifts acquired, in exchange for the right to use supervisory goodwill. This is a legitimate claim for entitlement. In fact, one district court has already determined

precisely this issue. *Far West Federal Bank, S.B. v. Director, Office of Thrift Supervision*, 746 F.Supp. 1042, 1050–51 (D.Or.1990).

Nor does this contract merely reflect an expression of regulatory policy, contrary to the government's assertion in reliance on *Bowen*, 477 U.S. 41, 106 S.Ct. 2390. There are several factors that should be considered when determining whether government action has gone beyond "regulation" and constitutes a "taking." "Among these factors are: 'the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations.'" *Ruckelshaus*, 467 U.S. at 1005, 104 S.Ct. at 2874 (quoting *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980); *see also Kaiser Aetna v. U.S.*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979); *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)).

In the present case, the economic impact of the governmental action and its interference with investment-backed expectations is extreme. If the OTS is permitted to go through with its intent to impose sanctions for Carteret's failure to meet the regulatory requirements, the damages are immeasurable. The institution itself will have lost the benefit of the current balance of what was initially over $200 million in supervisory goodwill, an amount it would have otherwise required in tangible assets before acquisition of the failed banks, or else it would not have entered the transaction. Its depositors and creditors will lose, to the extent that the institution is harmed both actually and in loss of reputation. Finally, the community could lose a valuable business which employs many people and pays taxes.

On the other hand, there is no evidence that imposition of the injunction (solely on the basis of the supervisory goodwill issue) will affect the government economically in any manner. There is no apparent threat that the regulatory agencies will be required to "bail out" Carteret in the near

future. Ironically the OTS' threatened actions are more likely to *produce* that result, if unrestrained. Thus, this factor also supports the validity of plaintiff's claim under the fifth amendment.

## D. *Irreparable Injury*

■ Carteret contends that it is going to suffer immeasurable and irreparable harm unless OTS is enjoined from excluding supervisory goodwill in its determination of whether Carteret is in capital compliance. Although this discussion is related to that required for consideration of plaintiff's fifth amendment claim, it must nonetheless be established for imposition of the preliminary injunction on the statutory claim as well.

There are three facets to the injury claimed by the plaintiff. The first is injury to reputation resulting from the declaration that Carteret is out of capital compliance. (Plaintiff's Br. at 52; Walsh Aff., ¶ 30). The second is the capital directive itself, and the requirements it imposes. (Plaintiff's Br. at 52; Walsh Aff., ¶ 35). The third is OTS' requirement that Carteret file a capital plan, without using supervisory goodwill, within a very short timeframe.[28]

This Court finds that Carteret has met its burden of showing it will suffer irreparable harm without the injunction. First, the only reason for OTS' infliction of noncompliance sanctions is its decision not to allow Carteret to utilize supervisory goodwill. OTS has not provided any evidence, nor even made any allegation, that Carteret is otherwise in danger of financial instability or is the subject of poor management. Rather, Carteret has provided substantial evidence of its recent efforts to improve its condition, despite the obvious difficulty of extremely poor market conditions (a problem which it cannot, of course, correct).

Second, Carteret is without question one of the largest such institutions in the State of New Jersey. It employs many citizens, handles the accounts of state residents and provides valuable services to the community. Therefore, any rumors that it may be experiencing difficulty are more likely to have an impact upon it. Furthermore, given the market conditions and the continuing S & L crisis involving fraudulent transactions at other institutions, such rumors are even more likely to result in diminished business for Carteret and increased withdrawals. In this case, the information about noncompliance is already more than a rumor; OTS has issued a press release describing how Carteret no longer meets statutory requirements. (*See* OTS' News Release, moved into evidence at TRO hearing as Plaintiff's Exh. 1, dated February 14, 1991, relating to OTS charges against AmBase).

This Court also finds that imposition of a capital directive and the requirement that Carteret file a capital plan are likely to cause it irreparable injury. Carteret would have to file a plan utilizing its supervisory goodwill, otherwise it would not meet the new stricter requirements of FIRREA. If it does so, OTS will reject the plan and likely institute further action against it. If, on the other hand, Carteret submits a plan without the supervisory goodwill, OTS will reject it because it does not meet all new capital standards. During the entire process, meanwhile, Carteret is prevented from engaging in any asset growth, which could further harm it by restricting its ability to improve its financial condition. (*See* 12 U.S.C. § 1464(t)(6)(B)(i)). It is also subject to considerable government regulations and control over its daily business decisions, thus further complicating and hampering the business.

Therefore, this Court finds that Carteret will suffer irreparable injury unless this Court enters a preliminary injunction against OTS, prohibiting it from excluding Carteret's supervisory goodwill in determining regulatory compliance.

## E. *Harm to Nonmoving Party and the Public Interest*

The last two factors to consider are whether granting preliminary relief will re-

---

**28.** At the initial TRO hearing, the deadline for the capital plan was February 28, 1991. As that date has come and gone, it is not clear precisely how much time Carteret would have to meet this requirement if this Court refuses to grant a preliminary injunction.

**1182**

sult in even greater harm to the nonmoving party, and whether granting preliminary relief will be in the public interest.

Granting Carteret relief will not result in greater harm to the government in this case than if the Court did not grant such relief. The concern Congress expressed in FIRREA is with institutions which fail; there is no evidence in the record that Carteret is likely to fail in the near future. Thus, OTS is not likely to suffer the consequences of having to "bail out" a failed bank as a result of this Court's imposition of a preliminary injunction on this issue. Similarly, granting the preliminary relief will be in the public interest precisely because that relief is designed to *prevent* (as much as possible) Carteret from suffering, and eventually failing, with all attendant expenses and losses falling ultimately on the taxpaying public.

## III. CONCLUSION

This Court has jurisdiction to hear several of plaintiff's claims, including its statutory and fifth amendment "taking" claims. Carteret has met its burden of showing a substantial likelihood of success on the merits of both types of claims. Furthermore, it has demonstrated that it will suffer irreparable injury unless this Court acts to enjoin the OTS from determining Carteret's capital compliance without using its contractually-bargained-for supervisory goodwill. Finally, this Court finds that imposition of such preliminary injunction will not result in greater harm to the OTS. In fact, the refusal to order such an injunction would not be in either OTS' or the public's interest.